Anne SNIZAVICH, Individually and Administrator of the Estate of Joseph Snizavich, Appellant

v.

ROHM AND HAAS COMPANY, Appellee.

Superior Court of Pennsylvania.

Argued May 14, 2013.
Filed Dec. 6, 2013.
Reargument Denied Feb. 3, 2014.

12. Southwestern's Motion to Suppress and/or Quash portions of MPT's reply brief is denied.

Aaron J. Freiwald, Philadelphia, for appellant.

Carl A. Solano, Philadelphia, for appellee.

BEFORE: STEVENS, P.J.*,
LAZARUS, J., and COLVILLE, J.**

* President Judge Stevens did not participate in the consideration or decision of this case.

** Retired Senior Judge assigned to the Superior Court.

OPINION BY LAZARUS, J.

Anne Snizavich ("Wife"), individually and as Administrator of the Estate of Joseph Snizavich, Deceased, appeals from the order granting summary judgment in favor of Rohm and Haas Company. After careful review, we affirm the order of the trial court.

Joseph Snizavich ("Decedent") worked as a pipefitter for Welsch Company for approximately thirteen years, spending much of that time working as a contractor at Rohm and Haas' Spring House Facility. Welsch Company completed many contracting jobs at Spring House, including work on air conditioning, refrigeration, and assembly/disassembly of the environmental chambers. Decedent was diagnosed with brain cancer in 2005, and died from his illness on September 19, 2008.

Wife filed suit against Rohm and Haas in April 2009, asserting causes of action under the Wrongful Death and Survival Acts,[1] in which she alleged that Decedent's brain cancer was caused by exposure to chemicals while working at Spring House, and that Rohm and Haas was liable.

Rohm and Haas filed a motion for summary judgment in August 2011, arguing that Wife had failed to submit expert testimony needed to prove causation. In response, Wife submitted the expert report of Thomas H. Milby, M.D. ("Milby Report"), after which Rohm and Haas' motion was denied on November 8, 2011. Rohm and Haas then filed a Frye[2] motion seeking to preclude Dr. Milby's testimony because it did not comply with the requirements for admission of expert testimony. Wife filed a response to Rohm and Haas' Frye motion, which included an affidavit from Dr. Milby explaining his methodology.

The trial court heard argument on the Frye motion on April 17, 2012, and, after granting Rohm and Haas' Frye motion, granted summary judgment for Rohm and Haas because Dr. Milby was Wife's only expert on the issue of causation. Wife filed a timely notice of appeal on April 20, 2012, followed by a court-ordered Pa. R.A.P. 1925(b) statement, after which the trial court issued a Rule 1925(a) opinion explaining the basis for its ruling.

In its Rule 1925(a) opinion, the trial court explained:

> it was not necessary to conduct a full Frye analysis on the report issued by Milby, as it failed both of the basic requirements of showing a coherent scientific or technical methodology to which any type of analysis could be applied as to its acceptance in the scientific community or showing that its conclusions would in any way assist the trier of fact to understand the evidence or a fact in issue.

Trial Court Opinion, 11/19/12, at 4.

The trial court was especially troubled by Dr. Milby's reliance on a report from the University of Minnesota ("Minnesota Report"), finding that there was a statistically higher occurrence of brain cancer amongst individuals who worked at Spring House, where thousands of chemicals had been used. Despite that finding, however, the Minnesota Report was inconclusive as to both the cause of the brain cancer found in the Spring House workers and the relationship between the chemicals and increased incidence of brain cancer. Nevertheless, the court stated, "Milby somehow comes to the exact opposite conclusion ... Milby, however, does not state any scientific methodology that he used nor does he

---

1. 42 Pa.C.S. §§ 8301(a) and 8302, respectively.

2. Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).

call into question the [study's] methodology that might make its findings incorrect, rather he simply states his own opposite conclusions without any further support." *Id.* at 6.

Additionally, the trial court found that Dr. Milby's conclusion as to causation was not actually based on a reasonable degree of medical certainty, despite Dr. Milby's use of "the magic words" to the contrary. *Id.* at 7. The trial court found that there was nothing in the Milby Report to provide any evidence for his conclusion, which the court described as "nothing more than a logical *post hoc ergo propter hoc* fallacy." *Id.* at 7.

Finally, the court found that the Milby Report "did not meet the basic requirements of Pa.R.E. 702" because no "scientific, technical or other specialized knowledge beyond that possessed by a layperson" was used to formulate the opinion. *Id.* at 8. "Ultimately, the Milby Report seems to be little more than an unscientific lay opinion given by someone who happens to be a medical doctor." *Id.* As such, Dr. Milby's testimony would not assist the trier of fact, because it "contained no evidence, causal or otherwise, linking the decedent's brain cancer to the Spring House facility." *Id.*

On appeal, Wife asserts that "the trial court err[ed] in disqualifying and precluding [her] expert[,] Thomas H. Milby, M.D." Brief of Appellant, at 5.

■ Although the order currently before the Court awarded summary judgment, "an appeal of a final order subsumes challenges to previous interlocutory decisions," such as preclusion of expert testimony. *Betz v. Pneumo Abex,* 615 Pa. 504, 44 A.3d 27, 54 (2012). "Generally, the appropriate appellate standard of review is the one pertaining to the underlying ruling." *Id.* Here, the trial court granted summary judgment after precluding Wife's

expert testimony and Wife's issue on appeal challenges the court's preclusion of her expert testimony. *See Haney v. Pagnanelli,* 830 A.2d 978, 980 (Pa.Super.2003). Admissibility of expert testimony is left to the sound discretion of the trial court, and as such, this Court will not reverse the trial court's decision absent an abuse of discretion. *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038, 1046 (2003), citing *Commonwealth v. Zook,* 532 Pa. 79, 615 A.2d 1 (1992). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.,* citing *Paden v. Baker Concrete Constr., Inc.,* 540 Pa. 409, 658 A.2d 341, 343 (1995).

The standard for admissibility of expert testimony is governed by Pennsylvania Rule of Evidence 702, which states:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702.

Rule 702 permits expert testimony on subjects concerning "knowledge beyond that possessed by a layperson." It is the job of the trial court to "assess the expert's testimony to determine whether the expert's testimony reflects the application of expertise or strays into matters of common knowledge." 1 Leonard Packel & Anne Bowen Poulin, *West's Pennsylvania Practice: Pennsylvania Evidence* § 702–3 (4th ed. 2013).

██ Admissible expert testimony that reflects the application of expertise requires more than simply having an expert offer a lay opinion. "Testimony does not become scientific knowledge merely because it was proffered by a scientist." *Wack v. Farmland Industries, Inc.*, 744 A.2d 265, 271 (Pa.Super.1999) *abrogated on other grounds by Trach v. Fellin*, 817 A.2d 1102 (Pa.Super.2003). Likewise, expert testimony must be "based on more than mere personal belief," *Commonwealth v. Stringer*, 451 Pa.Super. 180, 678 A.2d 1200, 1202 (1996), and "must be supported by reference to facts, testimony or empirical data." *Downey v. Crozer–Chester Medical Center*, 817 A.2d 517, 528 (Pa.Super.2003) (en banc).

The question thus becomes whether there is any minimal threshold that expert testimony must meet in demonstrating that the proffered testimony reflects the application of the expert's expertise, as opposed to simply being a lay opinion offered by an expert. Two cases, *Checchio v. Frankford Hospital–Torresdale Division*, 717 A.2d 1058 (Pa.Super.1998) and *Harris v. NGK North American, Inc.*, 19 A.3d 1053 (Pa.Super.2011), are instructive in this regard.

In *Checchio*, this Court affirmed a grant of summary judgment following the exclusion of plaintiff's proffered expert testimony on the issue of causation. Daniel Checchio, a minor, began exhibiting signs of respiratory distress only minutes after being born prematurely. Within two years, Daniel was diagnosed with pervasive developmental disorder, autism, and severe mental retardation. Suit was filed on his behalf alleging that the proximate cause of his neurological dysfunction was neonatal hypoxia, which he suffered as a result of the hospital's negligence in managing his respiratory distress.

The crux of [Checchio's] argument and the logical construct on which their case is grounded begins with the major premise that a lack of oxygen and blood flow to the brain can cause neurological damage. Daniel suffers neurological damage, the argument proceeds, therefore the damage must have been caused by oxygen deprivation.

*Checchio*, 717 A.2d at 1060.

The trial court found that Checchio's experts failed to demonstrate "any scientific basis, other than their own subjective beliefs, that autism and/or pervasive developmental disorders are caused by hypoxia in the context of respiratory distress or Respiratory Distress Syndrome." *Id.* (quoting Trial Court Opinion at 17). This Court agreed with the trial court's substantive conclusion that the expert testimony was inadmissible. In analyzing the proffered testimony, this Court noted that Checchio's first expert, Dr. Charash, testified that his conclusions were based entirely on his own observations and experience in the field, without any reference to outside sources on which he might predicate his findings. Checchio's second expert, Dr. Wynn, also based his opinion entirely on his own knowledge and experience. In fact, both Dr. Charash and Dr. Wynn "specifically denied reliance on any documented scientific authority for the proposition that impairments of the type from which Daniel suffers are caused by perinatal hypoxia." *Id.* at 1061. Checchio argued that the experts' opinions were sufficient despite the lack of outside sources or reliance on scientific authority because it is a medically established fact that lack of oxygen to the brain will eventually cause hypoxia, and, if the hypoxia is severe enough and lasts long enough, will result in acidosis and eventual death of brain tissue.

In rejecting this argument, this Court noted that such facts, even if true, "[do]

not explain whether the specific condition from which Daniel suffers is the result of brain tissue death or some other cause, or why, since oxygen deprivation affects all tissues according to Dr. Wynn, Daniel demonstrates no accompanying motor deficits, only impairment to that part of the brain which governs intelligence and communication." *Id.* Ultimately, this Court found that the proposed expert testimony was "inherently unreliable," because the experts had "scrupulously avoided the medical literature," and based their opinions "entirely on subjective assessments of both cause and effect." *Id.* at 1062. Therefore, because Checchio did not offer any "research, conducted by [his] own experts or anyone else, to support [his experts'] assertions on causation," the trial court had properly excluded the evidence. *Id.*

Conversely, in *Harris,* this Court reversed a grant of summary judgment following the exclusion of expert testimony on the issue of causation. Leonard Harris was diagnosed with chronic beryllium disease ("CBD"). CBD is a lung disorder caused by an immunologic response to beryllium in the lungs, and only individuals who have been exposed to beryllium, and have a specific immune response to it, can develop CBD. After Harris' death, the administrator of his estate alleged that the CBD was a contributing factor in Harris' death. As part of the *prima facie* case, the estate had to show that CBD caused Harris' shortness of breath. The estate offered the expert testimony of Dr. Glazer, a physician board certified in occupational/environmental medicine and pulmonary medicine, who reviewed Harris' medical records, discharge summaries and test results, and opined that Harris' shortness of breath was caused by his CBD. The trial court rejected Dr. Glazer's report because it "[did] not provide any facts or explain how he arrived at the conclusion that Mr.

Harris's [sic] shortness of breath was caused by his CBD." *Harris,* 19 A.3d at 1066 (quoting the Trial Court Opinion, 7/23/2009, at 7) (internal quotation marks omitted).

This Court disagreed with the trial court's conclusion, and found that:

> Dr. Glazer did explain the materials he reviewed during his evaluation [namely, Harris' medical records, discharge summaries and test results] and stated that he based his opinion on the[se] materials as well as his "knowledge of CBD gained from extensive training in beryllium related health effects and from my knowledge of the medical literature in this area," as well as his "experience evaluating patients with beryllium exposure and caring for individuals with beryllium related health effects including beryllium sensitivity and chronic beryllium disease."

*Id.* at 1067.

In reaching this conclusion, the *Harris* Court noted the similarity to the expert testimony rejected by the *Checchio* Court, and distinguished the cases by noting that "shortness of breath is a generally recognized symptom of chronic beryllium disease" according to the U.S. Department of Labor's Occupational Safety and Health Administration, but that the causal connection asserted in *Checchio* is not a relationship "supported by any documented scientific authority." *Harris,* 19 A.3d at 1067 n. 13. In other words, the expert testimony in *Checchio* was excluded because the experts failed to demonstrate that their opinions were based on more than mere personal belief by reference to facts, testimony or empirical data supporting the causal connection they asserted, but the expert testimony in *Harris* was permissible because it referenced outside data that supported the causal relationship.

■ The exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief. Thus, expert testimony as to a causal relationship may be admissible, even if based solely on the expert's review of medical records and his experience and expertise in the applicable medical field, when the expert can point to some scientific authority that supports the causal connection.

■ The proffered expert testimony in this case is more similar to the expert testimony rejected in *Checchio* than it is similar to the expert testimony accepted in *Harris*. Here, Dr. Milby, like the experts in *Checchio*, failed to demonstrate "any scientific basis, other than [his] own subjective beliefs," that the chemical used at Spring House cause brain cancer. *Checchio*, 717 A.2d at 1060. Dr. Milby, like Dr. Charash and Dr. Wynn, based his opinion entirely on his own knowledge and experience. In forming his opinion, Dr. Milby reviewed nine documents, eight of which dealt with Decedent's medical history, work history, and work conditions. The ninth document Dr. Milby reviewed was the Minnesota Report, which found a statistically higher occurrence of brain cancer amongst individuals who worked at Spring House. However, the Minnesota Report was inconclusive as to the cause of the brain cancer found in the Spring House workers and the relationship between the chemicals used at Spring House and brain cancer. Dr. Milby then concluded, based on the nine documents he reviewed as well as his years of expertise in epidemiology, toxicology and occupational medicine that Decedent's brain cancer had been caused by exposure to an unknown chemical or chemicals, while working at Spring House.

Missing from Dr. Milby's expert report is any scientific authority—any facts, testimony or empirical data—that supports his conclusion. Although Dr. Milby references and seems to rely on the Minnesota Report, he ignores the fact that it specifically and intentionally disclaims the exact conclusion that he himself reaches—that the instances of brain cancer in Spring House employees were caused by exposure to a chemical or chemicals while working at Spring House. *See* Trial Court Opinion, 11/9/12, at 6. Dr. Milby also does not offer any other scientific authority that even suggests a causal relationship between possible exposure to chemicals at Spring House and brain cancer, or any reason to doubt the scientific veracity of the Minnesota Report. The Milby Report may, therefore, be aptly described as "scrupulously avoid[ing] the medical literature," and based "entirely on subjective assessments of both cause and effect," as it does not include any "research, conducted by [Dr. Milby] or anyone else, to support [his] assertion[ ] on causation." *See Checchio*, 717 A.2d at 1062.

The Milby Report, predicated as it is on a relationship that "no documented scientific authority supports," and which Dr. Milby offers none of his own research to support, is more like the expert testimony in *Checchio*, than in *Harris*. Thus, the Milby Report was properly precluded as it failed to meet the basic admissibility re-

quirements for expert testimony and the trial court did not abuse its discretion in precluding it.

Order Affirmed; Motion to Submit Supplemental Authority is granted.