J-A35038-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CHRISTOPHER P. HENNESSEY, DINO R. RIZZA AND BRIAN L. SULLIVAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| WILLIAM B. ROM, | |
| Appellant | |
| v. | |
| OUTERCURVE TECHNOLOGIES, INC., OUTERCURVE INTERNATIONAL FZ, LLC AND DEREK G. ROGA, | |
| Appellees | No. 389 WDA 2014 |

Appeal from the Judgment Entered February 10, 2014
In the Court of Common Pleas of Allegheny  County
Civil Division at No(s): GD 10-013259

BEFORE:  BENDER, P.J.E., BOWES, and ALLEN, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 20, 2015**

William Rom appeals from the February 10, 2014 judgment entered on a verdict after the trial court's February 5, 2014 denial of Rom's post-trial motion.  The jury entered a verdict in favor of Plaintiffs/Appellees, Christopher P. Hennessey, Dino R. Rizza and Brian L. Sullivan, who were members of an investment group that we will refer to as Hennessey Group, in the amount of $2,000,000.  We affirm.

The evidence viewed in light most favorable to the verdict winner follows.  Hennessey Group, Rom, and Rom's business associate, Derek Roga,

participated in business transactions whereby members of Hennessey Group loaned $240,000 to two affiliated companies, Outercurve Technologies, Inc. and Outercurve International FA, LLC ("Outercurve"). Outercurve was to conduct computer hardware and software business in the Middle East. The funds were advanced by Hennessey Group by means of convertible promissory notes. In 2004, Outercurve received a loan from Hennessey Group of $200,000. Outercurve borrowed an additional $40,000 from Hennessey Group in 2006. Rom was an employee or consultant, shareholder, and officer of Outercurve and personally benefitted from the loans.

During 2006, the members of Hennessey Group were unwilling to provide the additional $40,000 in funding requested by Rom and Roga unless Rom and Roga personally guaranteed both the 2004 loan, which was in default, and the 2006 loan made to Outercurve. During the negotiations for the additional funding in 2006, Rom and Roga therefore agreed to personally guarantee the $240,000 funds advanced by Hennessey Group to Outercurve. Under the guarantees, in the event of default by Outercurve, Rom and Roga pledged four percent of their personal equity in Outercurve or any company formed to conduct the proposed business of Outercurve.

Members of Hennessey Group testified at trial that the 2006 personal guarantees were integral to the second loan transaction and that Hennessey Group would not have made the 2006 loan absent them. The assent of Rom and Roga to personally guarantee both loans was memorialized in an email

that pre-dated the funding of the 2006 loan by Hennessey Group, but the guarantees were not actually executed until after disbursement of the loan funds.

Shortly after the funding of the 2006 loan, Rom and Roga abandoned their operation of Outercurve and conducted the business that Outercurve was designed to perform under another company, Emitac Mobile Solutions ("EMS"). Rom and Mr. Roga were both employees or consultants of EMS, and each man owned eleven percent of EMS. Hennessey Group presented proof demonstrating that EMS was formed to conduct the proposed business of Rom and Roga in the Middle East that Outercurve was supposed to perform.

In 2007, Outercurve/EMS defaulted on the loans, and the personal guarantees were activated under the loan default provisions. At that point, Hennessey Group thus became entitled to receive the value of four percent of Rom and Roga's equity interest in EMS. After Hennessey Group demanded performance under the loan guarantees, Rom sold his eleven percent interest in EMS for $302,500.

Hennessey Group then instituted this action against Rom, Roga and Outercurve seeking to recover, in accordance with the personal guarantees, an amount equal to the 2007 value of four percent of EMS. Hennessey Group presented proof that four percent of EMS was worth between $532,000 and $2,532,000 in 2007. This proof was in the form of expert testimony as well as an exhibit, which was introduced without objection,

outlining that EMS was worth fifty million dollars in 2007. The jury awarded Hennessey Group $2,000,000. Rom appealed and raises these contentions for our disposition:

A. Whether the testimony of Appellee's expert appraisal witness should have been excluded pursuant to Rule 702 or the Pennsylvania Rules of Evidence and the **Frye** standard.

B. Whether Appellant was entitled to judgment notwithstanding the verdict because the "letters" upon which the Appellees claims were based lacked consideration.

C. Whether the lower Court erred by failing to instruct the jury on the principle of "gratuitous promises."

D. Whether the lower Court erred by failing to instruct the jury on the principle of "successor entity."

E. Whether the lower Court erred by failing to mold or remit the verdict to conform to the evidence.

Appellant's brief at 6.

Appellant first suggests that Hennessey Group's expert witness, Mark Gleason, was improperly permitted to testify about the value of EMS stock. Our standard of review is settled in this area:

Admissibility of expert testimony is left to the sound discretion of the trial court, and as such, this Court will not reverse the trial court's decision absent an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

**Snizavich v. Rohm and Haas Company**,. 83 A.3d 191, 194 (Pa.Super. 2013) (citations and quotation marks omitted). Additionally, "To constitute

- 4 -

reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McEwing v. Lititz Mut. Ins. Co.*, 77 A.3d 639, 651 (Pa.Super. 2013).

Rom maintains that that there is a *Frye* issue involved herein. *See Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).

> As we held in *Trach v. Fellin*, 817 A.2d 1102 (Pa.Super. 2003) *(en banc), appeal denied,* 577 Pa. 725, 847 A.2d 1288 (2004), the *Frye* test sets forth an exclusionary rule of evidence that applies only when a party wishes to introduce novel scientific evidence obtained from the conclusions of an expert scientific witness. *Trach,* 817 A.2d at 1108–1109. Under *Frye,* a party wishing to introduce such evidence must demonstrate to the trial court that the relevant scientific community has reached general acceptance of the principles and methodology employed by the expert witness before the trial court will allow the expert witness to testify regarding his conclusions. *Id.,* 817 A.2d at 1108–1109, 1112.

*Commonwealth v. Harrell*, 65 A.3d 420, 430 (Pa.Super. 2013); *see also* Pa.R.E. 702 (adopting the *Frye* standard in subsection (c) and stating "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if … the expert's methodology is generally accepted in the relevant field.").

Mr. Gleason, a certified public accountant with more than forty years of experience, was hired to place a 2007 value on EMS. He had testified over 100 times as an expert witness performing forensic accounting, which places a value on economic damages. Mr. Gleason testified that, when he was first approached by Hennessey Group, he was unable to perform an evaluation of EMS due to a lack of financial data. N.T. Trial, 11/4-8/13 Vol.

II, at 347. After discovery was conducted herein, he performed another analysis and arrived at a valuation based upon pleadings, documents produced in discovery, and independent research from websites and other professional sources.

Mr. Gleason proffered his opinion on EMS's value based upon a number of factors. The first one was the amount gained by Rom from the sale of his stock in 2007. Secondly, Mr. Gleason relied upon offers made by "Mr. Roga on behalf of Mr. Roga and Mr. Rom to buy 60 percent of EMS that was owned by" Emitac Technology Company ("Emitac"), which was the majority shareholder in EMS. *Id*. at 350. In documents produced during discovery, it was established that two offers were made in the fall of 2006 by Mr. Roga to purchase Emitac's sixty percent interest in EMS.

Mr. Roga was EMS's chief operating officer and thus was acquainted with its financial status. The first offer was "for $8 million for the 60 percent interest that Emitac owned" and that offer "was rejected." *Id*. "Then there was an offer of $38 million for the 60 percent interest in Emitac, which was also rejected." *Id*. at 350-51. The initial offer indicated that the overall value of the company was approximately thirteen million dollars with four percent being worth $520,00, while the second offer valued EMS at sixty-three million with four percent having a value of $2,520,00.

In addition to considering these offers, Mr. Gleason reviewed a business plan that EMS management developed in 2006. Mr. Gleason

reported that it was a "fairly extensive business plan where they indicated what their business was, who they dealt with, and included in that they had projections for the future." *Id*. at 351. The plan anticipated revenue for EMS for years 2006 through 2008. *Id*. Finally, Mr. Gleason read news articles about EMS wherein it reported contracts that it obtained in the Middle East.

Rom's specific argument is that Mr. Gleason's testimony was speculative since that witness admitted that he did not have some financial information about EMS needed to value EMS in accordance with normal business practices. As the trial court observed, while Mr. Gleason may have been unable to obtain certain financial data about EMS, he had a solid foundation for his valuation of its stock. The most important data consisted of the two offers that Mr. Roga made to purchase Emitac's interest in EMS not long prior to the occurrence of default herein.[1] Mr. Gleason's testimony herein was amply supported and cannot be considered to contain a valuation methodology that was novel. We therefore reject Rom's first contention on appeal.

_____

[1] The Hennessey Group also introduced Exhibit 44, which showed that EMS had a fifty million dollar value in 2007 so that four percent of that company was worth two million dollars, which was the amount of the verdict. That exhibit was submitted into evidence without objection. While Hennessey Group thus suggests that the introduction of Mr. Gleason's testimony was harmless error, it is impossible to ascertain with certainty the basis for the jury's decision, which may have been influenced by Mr. Gleason's opinion. Hence, we decline to employ a harmless error analysis.

Rom next maintains that judgment notwithstanding the verdict should be entered in his favor in that the personal guarantee that he executed lacked consideration. He asserts that he did not receive anything of value in exchange for his guarantee. Appellant's brief at 25.

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. **Davis v. Berwind Corp.**, 547 Pa. 260, 690 A.2d 186 (1997) (citing **Moure v. Raeuchle**, 529 Pa. 394, 604 A.2d 1003 (1992)). When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. **Korn v. Epstein**, 727 A.2d 1130 (Pa.Super. 1999), *appeal denied,* 743 A.2d 921 (Pa. 1999). In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. **Id**. Concerning any questions of law, our scope of review is plenary. **Davis**, *supra*; **Boutte v. Seitchik**, 719 A.2d 319 (Pa.Super. 1998). Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. **Sewak v. Lockhart**, 699 A.2d 755 (Pa.Super. 1997). If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. **Id**. A JNOV should be entered only in a clear case. **Nogowski v. Alemo-Hammad**, 456 Pa.Super. 750, 691 A.2d 950 (1997) (*en banc*), *appeal denied,* 550 Pa. 684, 704 A.2d 638 (1997) (citing **Moure**, *supra*).

**Buckley v. Exodus Transit & Storage Corp.**, 744 A.2d 298, 304-05 (Pa.Super. 1999).

Rom's position ignores the proof submitted by the prevailing party herein. Hennessey Group established that, even though executed after the

loan distributions, the guarantees were integral to and negotiated in connection with the 2006 loan and that Outercurve needed the 2006 loan. The personal guarantees were supported by consideration flowing to Rom since he was a consultant or employee and shareholder of Outercurve and was financially benefited when it received funds to satisfy an urgently outstanding debt.

Brian Sullivan testified as follows about the circumstances leading to the execution of the personal guarantees. He, Christopher Hennessey, and Dino Rizza loaned $200,000 to Outercurve in 2004. In 2006, Rom and Roga told him that they needed more money. The 2004 loan to the company "was past due at the time of the second loan[.]" N.T.Trial, 11/4-8/13 Vol I., at 86. Mr. Sullivan continued, "[O]bviously we said, if we're going to loan [Rom, Roga and Outcurve] more money, we're going to want, you know different terms. We want, you know, . . . some sort of collateral on that loan." *Id*. The collateral demanded when Hennessey Group was "structuring this second loan in 2006, in March of 2006," was that Hennessey Group wanted a personal guarantee that Rom and Roga would give Hennessey Group "stock in this company or any successor entity in the region." *Id*. at 87. Mr. Sullivan testified that Rom and Roga agreed to the personal guarantee. Rom's guarantee was executed after the loan was distributed but backdated to reflect that it was part of the March 2006 loan transaction.

Christopher Hennessey, Mr. Sullivan's business colleague, testified consistently. Mr. Hennessey, Mr. Sullivan, and Mr. Rizza agreed to loan $200,000 to Outercurve in June 2004, and the full amount of the loan was due one year later. That amount was not repaid, when, in March 2006, Rom and Roga approached him for another $40,000 loan to Outercurve. Outercurve needed the funds to satisfy a debt that it owed to Tech Edge, which had been instrumental in introducing Outercurve to a solid client base in Saudi Arabia. Mr. Hennessey explained, "There was a lot of urgency to get [Tech Edge] paid." *Id*. at 235.

When Rom and Roga approached Mr. Hennessey for the $40,000 to pay Tech Edge, he was unwilling to make the loan since Hennessey Group had not "been paid on the first loan yet." *Id*. at 236. Mr. Hennessey explained, "So we're not about to make a second loan without some sort of backing to it, without some sort of guarantee to it, so that if we didn't get repaid, we would have some equity ownership in – to cover both loans that have been made, both the first loan and the second loan." *Id*.

Mr. Hennessey communicated to Rom and Roga that his group would not loan them the $40,000 absent personal guarantees from them. Rom and Roga agreed to execute the personal guarantees before the loan was paid. Specifically, Mr. Hennessey delineated that, after Rom and Roga asked for the $40,000 from Hennessey Group,

> we came back to them and said, yes, but first of all, we need to connect the two notes, the first note, and if we're going to make

a second loan, the second note, and secondly we need a guarantee. We need a guarantee that if this doesn't happen, we don't get repaid on either note, then some conversion -- we're going to get shares of stock, not a conversion, but we're going to get your shares of stock as a failsafe guarantee so that we have some value out of both loan transactions.

All right. And did you mention that to Mr. Rom and Mr. Roga?

A. We did.

Q. And what was their reaction?

A. They were agreeable to that.

Q. Agreeing to include the --

A. Including -- include language in the guarantee and the note that would cover successor entities.

Q. Okay. And as far as the timing of when these discussions that you just mentioned and Mr. Rom and Mr. Roga agreeing to those terms, can you tell me what the time frame was --

A. Sure.

Q. -- when that was happening?

A. This would have all been -- these discussions would have occurred in March of 2006, leading up [to the loan], and it was probably the last couple weeks of March, leading up, because remember there was a sense of urgency here, leading up to the actual note and the guarantee at the end of March of 2006.

Q. Now, who was creating this sense of urgency? Was it the Plaintiffs or was it somebody else?

A. No. The sense of urgency was created by Mr. Rom and Mr. Roga. We need this money because we have to pay off this agent, Tech Edge.

- 11 -

Q. All right. And you communicated that to Mr. Rom and Mr. Roga?

A. We did.

Q. And what was their reaction?

A. Well, their reaction was, yes, we can go ahead with that. We'll do a guarantee, and we'll get a second note, second promissory note, which will connect the first note to the second note, and the second note also would be broader, would not only be a loan that we're making to Outercurve International, but also to entities or successor companies, so that we could go after successor companies or entities.

Q. And why was that important to you? Why did you feel that that was important?

A. Well, all this period of time that had evolved, the companies were evolving. I mean, we had started in the United States with Outercurve Technologies, then it was Outercurve Delaware, and now there was Outercurve International, and then there was these other companies such as Emitac and Tech Edge. So we were concerned that at some point Outercurve International might evolve into another company, so we wanted to make sure if that happened we had protection.

N.T. Trial, 11/4-8/13 Vol. II, at 249-250. The $40,000 was loaned to Outercurve before the personal guarantees were executed in writing, but the agreement concerning the guarantees was memorialized in emails.

Based upon the above adduced proof from Hennessey Group, which we are required to accept for purposes of deciding whether Rom is entitled to judgment as a matter of law, it is abundantly clear that the personal guarantees were supported by consideration in the form of a second loan that was urgently needed. Rom assented to the personal guarantee during negotiations and in order to secure the funds for his company, and he

benefited from the loan.  The fact that the personal guarantee was executed after the loan disbursement is a red herring and Rom's position on appeal is lacking in merit.  Hence, we decline to vacate the judgment entered in favor of the Hennessey Group.

Rom next suggests that the trial court should have instructed the jury on the concept of a gratuitous promise.  Our standard of review of this contention follows:

> Under Pennsylvania law, our standard of review when considering the adequacy of jury instructions in a civil case is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue that error in a charge will be found to be a sufficient basis for the award of a new trial.

*Drew v. Work*, 95 A.3d 324, 329 (Pa.Super. 2014) (citation omitted). Moreover: "As a general rule, refusal to give a requested jury instruction containing a correct statement of the law relating to the issues raised by the evidence is grounds for a new trial **unless** the substance of that point has been covered in the court's charge as a whole." *McManamon v. Washko*, 906 A.2d 1259, 1270 (Pa.Super. 2006) (citation omitted; emphasis added).

Rom maintains that the trial court erred in declining to give Rom's proposed point for charge as to the concept of gratuitous promise since the law relating to gratuitous promise was crucial for the jury's understanding of whether the personal guarantee was supported by consideration. Appellant's brief at 32.  We conclude that the concepts of consideration and

- 13 -

gratuitous promise were clearly and adequately conveyed by the instructions disseminated by the trial court, which included the following:

> There must be consideration given by each party to a valid contract. That is, each party must have bargained to exchange their promise for another. The exchanged promises are either promises to perform or promises not to perform some act. The value or adequacy of the consideration given will not usually be examined, but the circumstances that surround -- that show that both parties were capable of bargaining will be examined. In that sense, competent people are free to contract, and even if one makes a bad deal, they are bound by the agreement.
>
> Now, **one's promise to make a gift to another is not an enforceable promise since no consideration was given for that promise** and thus no contract was created. There is, however, consideration where one promises to use his or her best efforts. Yet **no consideration will be found upon which to base a contract if one party has promised to do something that they are already obligated to do, such as repay a preexisting debt**.

N.T. Trial, 11/4-8/13 Vol. IV, at 760-61 (emphases added). Since the concept of gratuitous promise was adequately covered by the instructions, Rom is not entitled to a new trial based upon the trial court's refusal to give Rom the precise instruction that he requested.

Rom also maintains that the court improperly failed to charge the jury on the definition of successor entity. Rom references the legal definition of successor entity under case law examining whether corporate successor liability attaches to a corporation that has merged with or purchased the assets of another corporation. *See Fizzano Bros. Concrete Products, Inc. v. XLN, Inc.*, 42 A.3d 951 (Pa. 2012). Rom maintains that the jury had to find that EMS was a successor entity to Outercurve, as defined by the

case law on corporate successor liability, in order to find that the personal guarantee applied to Rom's stock in EMS.

Rom's position is untenable. The parties hereto executed a document. The issue was whether the personal guarantee covered Rom's equity interest in EMS under the terms of that writing and not whether EMS was liable for Outercurve's debts under the doctrine of corporate successor liability. Specifically, Rom executed a personal guarantee under which Hennessey Group was entitled to four percent of Rom's equity in Outercurve if there was default under the loan. The guarantee additionally provided, "Pursuant to your Promissory Note with Outercurve International, FZ-LLC dated March 27, 2006, . . . .we, Derek G. Roga and William B. Rom personally guarantee you equity participation within Outercurve International, FZ-LLC **or any such entity formed to conduct the proposed business**." Defendant's Exhibit 5A (emphasis added). The document also recited, "This guarantee of equity is provided you in the event the existing promissory note with Outercurve Technologies, Inc. dated on or about June 16, 2004 is defaulted on, and we, under no obligation or responsibility for such note, agree to make this equity allocation to you from our personal equity holdings in Outercurve International, FZ-LLC **or any successor entity**." *Id*. (emphasis added).

It is established that, "In the cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are

to be given their ordinary meaning." ***Lenau v. Co-eXprise, Inc.***, 102 A.3d 423, 429 (Pa.Super. 2014). The document in question was a contract. Thus, the meaning of "successor entity" as well as "any entity formed to conduct the proposed business" was to be given their ordinary meaning as envisioned by the parties. The legal elements that define successor entity for purposes of corporate successor liability had no application herein. Hence, the trial court did not err in failing to instruct the jury on that concept. ***Drew***, ***supra*** at 329 (citation omitted) ("The trial court may charge only on the law applicable to the factual parameters of a particular case and it may not instruct the jury on inapplicable legal issues.").

Finally, Rom seeks, based upon the fact that he sold his interest in EMS for $302,400, to reduce the damages award. "[T]he decision on a requested remittitur is addressed to the discretion of the trial court." ***Zauflik v. Pennsbury School Dist.***, 104 A.3d 1096, ___ (Pa. 2014). "A remittitur or judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." ***Id***. (citation and quotation marks omitted). "The matter is peculiarly within the discretion of the trial court and will not be reversed unless an abuse of discretion or an error of law has been committed." ***Id***.

(citation and quotation marks omitted). The damages award in this case was supported by the testimony of an expert witness and Exhibit 44 and hardly fails to shock this Court's sense of justice. Hence, we perceive of no abuse of discretion.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/20/2015