J-S07033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| RANDY HOFFMAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JOSEPH DUGAN, INC. AND JOSEPH | : | |
| B. CALLAGHAN, INC. AND 2601 | : | |
| PARKWAY DEVELOPMENT, LLC AND | : | |
| 2601 PARKWAY CONDOMINIUM UNIT | : | |
| OWNERS ASSOCIATION A/K/A 2601 | : | |
| PARKWAY CONDOMINIUM | : | |
| ASSOCIATION AND DREW | : | |
| KARLBERG | : | |
| | : | |
| | : | |
| APPEAL OF: JOSEPH DUGAN, INC. | : | No. 2425 EDA 2022 |

Appeal from the Judgment Entered September 21, 2022
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 190702489

BEFORE: DUBOW, J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.:                          **FILED JUNE 6, 2023**

Appellant, Joseph Dugan, Inc., appeals from the judgment entered in the Philadelphia County Court of Common Pleas, in favor of Appellee, Randy Hoffman, in this negligence action.[1]  We affirm.

The relevant facts and procedural history of this case are as follows.  On July 31, 2017, Appellee was moving out of her first-floor unit apartment in Philadelphia.  Her mom, Wendy Hoffman, drove to Philadelphia from Long Island, New York, to assist Appellee with the move.  When Appellee attempted

---

[1] The other defendants listed in the caption are not parties to this appeal.

to open a window security grate[2] located on the exterior side of one of her apartment windows for the purpose of moving items out of her apartment, the grate dislodged and fell on Appellee, pinning her right, dominant arm between the grate and the windowsill.[3]  Appellee's mom tried to lift the grate off Appellee's arm, but it was too heavy.  Fortunately, the movers Appellee had hired were already there and able to lift the grate off Appellee's arm.  After the movers freed Appellee's arm from the grate, Appellee took an Uber to the closest hospital and Appellee's mom stayed with the movers to finish the moving-out process.  Once the move was complete, Appellee's mom met Appellee at the hospital.  X-rays confirmed that Appellee suffered a broken ulna.  Following her discharge, Appellee could not return to her new apartment to unpack and had to stay with her mom in Long Island for the next week, as the injuries to her arm impeded her ability to care for herself.

Appellant is a contracting company that had been responsible for reinstallation of the window grate prior to the incident.  On July 19, 2019, Appellee filed a complaint against Appellant and others alleging negligence.  On April 26, 2022, Appellant filed a motion *in limine* seeking to preclude testimony from Appellee's proffered expert witness, Sylvia Deye.  Appellee

_____

[2] The record sometimes refers to the window grate interchangeably as a window gate.

[3] Appellee's landlord, defendant Drew Karlberg, had given Appellee permission to open the window grate for the purposes of moving items out of the apartment.

responded to the motion on May 10, 2022. On June 27, 2022, the court denied Appellant's motion.

A jury trial commenced on July 27, 2022, at the conclusion of which the jury found Appellant liable for Appellee's injuries.[4] The jury awarded Appellee $500,000.00 in damages.[5] On July 8, 2022, Appellee filed a motion for delay damages. On July 11, 2022, Appellant filed a motion for post-trial relief seeking judgment notwithstanding the verdict, a new trial, and/or remittitur. The court denied Appellant's motion by order dated August 10, 2022, and filed August 23, 2022. On August 29, 2022, the court granted Appellee's motion for delay damages. On September 21, 2022, Appellant filed a *praecipe* to enter judgment on the verdict and filed a timely notice of appeal that day. The court did not order, and Appellant did not file, a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises three issues for our review:

> Did the trial court err in denying the motion for a new trial on disfigurement damages when there was no evidence of permanent disfigurement?

> Did the trial court err in refusing to remit the verdict on future wage loss when the jury's decision was purely speculative as there was no evidence which showed plaintiff would suffer future wage loss?

---

[4] The jury found Appellant was 90% responsible for Appellee's injuries and found Mr. Karlberg 10% comparatively negligent.

[5] Specifically, the jury awarded Appellee $250,000.00 for pain and suffering, $100,000.00 for disfigurement, and $150,000.00 for past lost earnings and loss of earning capacity.

- 3 -

Did the trial court abuse its discretion in admitting the testimony of [Appellee's] liability expert Sylvia Deye, answered in the negative below, when Ms. Deye testified outside the scope of her written report, and beyond her expertise?

(Appellant's Brief at 4).

In its first issue, Appellant argues that Appellee failed to present evidence of a permanent disfigurement. Appellant acknowledges that Appellee provided photographs of her arm immediately after the accident. Appellant contends that Appellee testified at length as to how her arm usage was diminished, but Appellee did not provide any such testimony or visuals as to her arm's appearance at the time of trial to demonstrate a deformity. Appellant also acknowledges that Appellee provided evidence of the condition of her arm during the healing process. Appellant claims, however, that "[g]iven the dearth of demonstrative evidence presented by [Appellee] of the physical condition of her healed arm, it is impossible for the Court to determine if the jury's finding of a visible deformity was in error." (*Id.* at 14). Appellant insists that Appellee presented no demonstrative evidence of **permanent** disfigurement, such that the matter must be remanded for a new trial. We disagree.

As a preliminary matter, we note that Appellant appears to be under the mistaken impression that Appellee was required to demonstrate "permanent disfigurement" to recover disfigurement damages in this case. To be sure, Appellant cites *Walsh v. City of Philadelphia*, 526 Pa. 227, 585 A.2d 445

- 4 -

(1991) and *Alexander v. Benson*, 812 A.2d 785 (Pa.Cmwlth. 2002) to support its first issue on appeal. As Appellee correctly points out in her brief, however, those cases are not applicable here. In both *Walsh* and *Alexander*, the negligence claims filed by plaintiffs were against local agencies, which usually enjoy governmental immunity. Nevertheless, there is an exception to such immunity for situations involving the negligence of the local agency in the operation of real property and/or motor vehicles in its possession or control. In such situations, however, damages for pain and suffering are recoverable only "in cases of permanent loss of a bodily function" or in cases of "permanent disfigurement." *Walsh, supra* at 230-31, 585 A.2d at 446-47; *Alexander, supra* at 787.[6] Here, Appellee did not sue a local agency, so the requirement of "permanent disfigurement" applicable in *Walsh* and *Alexander* is not relevant here.

Appellant also cites *Mansfield v. Lopez*, 432 A.2d 1016 (Pa.Super. 1981), a case in which this Court remanded for a new trial because there were no stenographic notes of testimony taken. In the absence of a transcript, this Court concluded in *Mansfield* that it was impossible to determine whether there was merit to any of the appellant's arguments. *Id.* at 572.

---

[6] In *Alexander*, the jury found that the plaintiff's son did not suffer "permanent disfigurement" based on a scar below the son's wrist. *Id.* at 788. In *Walsh*, our Supreme Court decided that the plaintiff's noticeable half-inch difference in the size of his left quadricep and calf as a result of the injury he sustained constituted "permanent disfigurement." *Walsh, supra* at 243, 585 A.2d at 453.

Here, Appellant insists we should similarly remand for a new trial based on Appellee's lack of evidence concerning her current "permanent disfigurement." Nevertheless, as we have already stated, Appellee was not required to show "permanent disfigurement." Additionally, unlike the facts of *Mansfield*, the record in this case contains the complete notes of trial testimony.

Furthermore, the record contains ample evidence of Appellee's current deformity. As the trial court explained:

> [Appellee] testified to a permanent deformity to her dominant arm and physically demonstrated from the witness stand. [Appellee's] medical expert, Dr. Mandel, not only agreed that he observed the deformity, he also explained the medical reason for it based upon the nature of the undisputed bone break and he exhibited it to the jury on the X-ray of [Appellee's] forearm. Suggesting that this testimony did not constitute "visible evidence" is disingenuous. Counsel, seeking to minimize the recovery against his client, [argued] the injury might be considered … to be "healed" and not of sufficient or (in its view) permanent severity to constitute disfigurement. Defense certainly had the fulsome ability to challenge this on cross-examination of [Appellee's] expert or could have retained a qualified[,] competing expert to offer a different admissible opinion. As to the latter option, [Appellant] declined to do so. Thus, Dr. Mandel's expert observations and conclusions were essentially unchallenged, except to the extent of any inroads [Appellant's] counsel secured on cross examination. Furthermore, defense counsel agreed to the court charging the jury on non-economic loss and submitted a verdict slip containing a provision for assessing damages for disfigurement.
>
> … At no time during the trial did [Appellant] object to the testimony of [Appellee] to the recovery of disfigurement damages. At no time during the trial did [Appellant] object to the testimony of [Appellee] or Dr. Mandel that addressed

the claimed deformity in her arm. At no time did [Appellant] specifically move to dismiss any claims for disfigurement as an element of damages. And, finally, at no time during the trial did [Appellant] present a single witness to assert either that [the] type of injury or the residual evidence of the healed fracture could not possibly show a deformity. Contrary to the contention that the record failed to support the claim, the court concludes that [Appellant] failed to impeach [or] contradict that [Appellee] did not suffer a deformity, and the testimony of [Appellee] and Dr. Mandel was available to the jury to believe or disbelieve [Appellee's] evidence and [Appellant] was permitted to argue accordingly.

… [Appellant] was given a full and fair opportunity to cast doubt on the testimony of [Appellee] and Dr. Mandel. What [Appellant] failed to do was offer a competing…expert to support its contentions and to argue the medical evidence to the jury in [Appellant's] defense. Here, the jury had apparently…compelling…evidence [presented by Appellee] and only two employee witnesses of [Appellant] that did not address nor were offered or competent to dispute causation or the extent of the injury. Thus, the jury's verdict confirms that the jury weighed and valued the testimony in support of [Appellee's] case over the self-serving, limited and inconsistent testimony of [Appellant's] witnesses.

\* \* \*

[Appellant]…suggests that [Appellee] had fully recovered and made that argument to the jury. However, [Appellee's] medical expert showed the jury X-rays of the injury which he used to demonstrate a bowing in the bone injured in the accident, which [Appellee] confirmed by showing the claimed deformity in her arm to the jury. The defense of "I don't see it, it isn't visible" obviously did not persuade the jury, and [Appellant] offered no medical testimony to support its "faker" defense.

(Trial Court Opinion, filed 8/23/22, at 2-4, 18).

The record supports the trial court's analysis. Dr. Mandel testified as a

Board-certified orthopaedic surgeon, qualified to offer expert medical

- 7 -

testimony.[7]   Dr. Mandel evaluated Appellee on April 24, 2019, almost two years after the incident.  Dr. Mandel explained that Appellee suffered a broken ulna after the window grate fell on her arm.  Dr. Mandel indicated that even when a broken bone heals, that does not necessarily mean a patient is restored back to how she was before the accident; the bone may remain displaced and the patient may have a deformity.  Further, just because the bone has healed does not "necessarily mean that those other soft tissues that you can't see in an x-ray are back to normal either."  (*See* Deposition of Dr. Mandel, 6/20/22, at 22; R.R. at 1147a).  Specifically, regarding Appellee, Dr. Mandel stated that "there was a visible deformity of the right forearm in the area of the ulna because of angulation of the ulna that was apparent just with [his] looking at the arm and feeling the arm."  (*Id.* at 24; R.R. at 1149a).  Additionally, Appellee had ten degrees less rotation of the right forearm in each direction.  (*Id.* at 25; R.R. at 1150a).  She had "significant loss of grip strength."  (*Id.* at 26; R.R. at 1151a).  Based on tests Dr. Mandel performed, there was a 90 to 95 percent likelihood that Appellee developed carpal tunnel syndrome as a result of the trauma to her arm.  (*Id.* at 27; R.R. at 1152a).  Appellee also was ten degrees limited in volar flexion.  (*Id.* at 28; R.R. at 1153a).

Dr. Mandel further opined that Appellee's "loss of motion is permanent."

---

[7] At trial, Appellee introduced the videotaped deposition testimony of Dr. Mandel.  Thus, we cite to the notes of testimony from Dr. Mandel's deposition.

(*Id.* at 36; R.R. at 1161a). Dr. Mandel went on to state "that as far as her deformity was concerned, that was permanent." (*Id.*) "The only way to eliminate that would be to operate, re-break the arm, and realign it. But then she would…have a big scar instead. So [he] didn't think that was indicated." (*Id.* at 36-37; R.R. at 1161a-1162a). Dr. Mandel also stated that Appellee's pain "was something that she was living with and was going to persist." (*Id.* at 37; R.R. at 1162a). Ultimately, Dr. Mandel opined that he did not "think there's anything that really could have been done to bring her back a hundred percent. [Appellee] would have been left with some—some deficits regardless." (*Id.* at 48; R.R. at 1173a).

On this record, even though Appellee was not **required** to demonstrate a permanent disfigurement, Appellee provided ample evidence of her disfigurement as a result of her injuries. Appellant posed no objection to the verdict slip seeking damages for disfigurement, and we see no reason to disrupt the jury's award of disfigurement damages based on the evidence presented. *See generally Davis v. Mullen*, 565 Pa. 386, 773 A.2d 764 (2001) (explaining that whether plaintiff suffered compensable injury and extent of such injury are strictly within purview of jury). Therefore, Appellant's first issue on appeal merits no relief.

In its second issue, Appellant argues that Appellee presented no evidence or testimony to show a loss of earning capacity. Appellant states that prior to the incident in question, Appellee was attending school for social

work and was not yet employed in that field. After the incident, Appellant maintains that Appellee found employment as a social worker. Appellant claims Appellee presented no evidence that she lost earning power or the ability to earn money based on the accident. Rather, Appellant contends that Appellee maintained social work positions after the accident and went on to change jobs, presumably to a better paying position. In the absence of any evidence to quantify future wage loss, Appellant concludes the evidence presented was speculative and the verdict should be remitted, or a new trial granted. We disagree.

This Court has explained:

> Our standard of review from the denial of a remittitur is circumspect and judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. Furthermore, [t]he decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur.

*Tillery v. Children's Hospital of Philadelphia*, 156 A.3d 1233, 1246-47 (Pa.Super. 2017), *appeal denied*, 643 Pa. 119, 172 A.3d 592 (2017) (internal citations omitted).

Additionally:

> [T]o recover for the loss of wages, a plaintiff must establish a wage loss that is the result of the negligence of the

defendant. With respect to impairment of earning capacity, the law requires only proof that the injured person's economic horizons have been shortened as a result of the tortfeasor's negligence. The consideration of loss of earning capacity is not solely the comparative amount of money earned before or after an injury. The true test is whether or not there is a loss of earning power, and of ability to earn money. An award of damages for lost future earning capacity must be supported by evidence linking the plaintiff's injuries to loss of earning capacity.

*Mader v. Duquesne Light Company*, 199 A.3d 1258, 1267 (Pa.Super. 2018) (internal citations and quotation marks omitted). "[I]t is for the jury to decide the extent and duration of the loss." *Fish v. Gosnell*, 463 A.2d 1042, 1051 (Pa.Super. 1983). "Our law recognizes that 'normally' the first years of participation in the labor force yield lower earnings while the plaintiff is maturing and acquiring skills, the middle years are dominated by productivity and growth, and higher earnings, while in the later decades, increases, if any, taper off." *Id.* Proof in support of claims for damages is legally sufficient if it affords the factfinder a "reasonably fair basis for calculation." *Id.* (internal citation omitted).

Instantly, the trial court explained:

[Appellant] does not argue that [Appellee] was incompetent to testify as to the impact the injury had on her employment prospects and plans or that she misrepresented her earnings once she suffered or to the extent recovered from the injury sufficiently to secure employment. [Appellant] also does not suggest that only an expert could evaluate her losses. Thus, it was not error for the court to allow the testimony or to conclude that the testimony provided a factual and sufficient basis upon which the jury could determine whether she suffered damages related to lost wages and lost employment opportunities. … [Appellant's]

- 11 -

only argument is that [Appellee's] testimony, alone, is not a sufficient basis upon which to calculate the loss. However, [Appellant] cites no legal authority to support this argument.

[Appellant] had, again, the opportunity to extensively cross examine [Appellee] as to her prospects and, also, as to the timing of her actually securing employment and the issues attendant to her ability to function on account of the injury, all of which related to her claim that she could not fully realize her income potential as a result of residual disability for which she required an accommodation. [Appellant] was also free to challenge [Appellee's] testimony by presenting a medical expert to dispute [her] claim of physical deficiencies affecting her job performance but again elected not to retain an expert. [Appellant] could also have chosen to challenge [Appellee's] financial records to undermine her claim. [Appellant] does not claim that it did not have access to such records. To the contrary, it appears that [Appellant's] possum strategy [was] to allow [Appellee] to testify as to her damages and put her case into the record, and thereafter to object only after the verdict based upon a claimed insufficiency of evidence (after having made only a broad, omnibus motion for directed verdict at the close of trial). …

\* \* \*

Here, the testimony bore out that [Appellee] suffered a serious injury that created permanent deformity, that the injury occurred at a critical time in [Appellee's] career path and as she completed a graduate degree leading to a professional career track, as to which [Appellee] secured employment immediately upon recovering from the injury, but with residual issues that required accommodation and affected her ability to perform certain types of employments. On the basis of the record before the court, having observed the entirety of the trial and having considered the insufficiency of the defense that [Appellant] elected to present, this court cannot conclude that the jury's verdict is anything other than fully supported by the evidence and a proper result of the court's instructions on calculating damages for this injury to a then-27 year old [Appellee] who continues to experience residual pain and

requires accommodations to her employment.

(Trial Court Opinion at 4-6, 19).

The record supports the court's analysis. Appellee testified that she was 27 years old on July 31, 2017—the date of her injury. She had recently finished a master's program for social work at the University of Pennsylvania and was in the midst of an employment search. Appellee secured employment in February of 2018, approximately six months after the injury. Appellee explained that her first job in February 2018 was doing social work at Mercy Fitzgerald and Mercy Philadelphia. Appellee said she was unable to secure employment sooner based on her injuries because she was not able to type or handwrite notes, was easily exhausted, and feared the repercussions of asking for accommodations for her injuries. Appellee left her job at Mercy after two months when she received a better opportunity at Drexel University's counseling center. Specifically, Drexel made special accommodations for Appellee's injuries including a special mouse and gel rest, and speech-to-text technology. A few weeks prior to trial, Appellee was offered a new job opportunity with the United States Senate to do therapy for the Sergeant at Arms. Notwithstanding her employment and job prospects, Appellee explained that she still suffered from her injuries at the time of trial. Appellee said she has difficulty writing for too long; she gets a "tingly" feeling and then her arm goes numb. As writing notes is a crucial component of her social work responsibilities, her injury made this aspect of her employment

much harder.  (*See* N.T. Trial, 6/27/22, at 92-122; R.R. at 861a-891a).

Dr. Mandel confirmed that had Appellee sought post-graduate employment between the date of the accident and the date when she began working in February 2018, the injuries to her right wrist and forearm would have significantly impaired her ability to carry out certain duties such as keyboard typing or note-taking by hand.  (*See* Deposition of Dr. Mandel at 45; R.R. at 1170a).  Specifically, Appellee was immobilized in one of the treatment devices after the incident and then casted several times.  Thereafter, Appellee wore a clamshell-type brace for three months.  During that period when Appellee was initially being treated after the incident, "she really would not have had much function at all of her hand."  (*Id.* at 46; R.R. at 1171a).  After her arm had been immobilized for several months, Appellee would be weak and stiff, and it would have taken her a while to regain her dexterity.  (*Id.*)  Thus, Dr. Mandel opined that Appellee would not "have been able to do the job of a social worker with any sort of efficiency, or even get the job done during that initial period of time."  (*Id.* at 47; R.R. at 1172a).

The record supports the jury's award of damages for lost earnings and loss of earning capacity.  ***See Mader, supra***; ***Fish, supra***.  As such, we see no abuse of discretion or error of law in the court's denial of Appellant's post-trial motion seeking remittitur.  ***See Tillery, supra***.  Therefore, Appellant's second issue on appeal merits no relief.

In its third issue, Appellant argues the court erred by denying its motion

*in limine* seeking to preclude testimony from Appellee's expert, Sylvia Deye. Appellant claims that Ms. Deye is an architect "but has no specialized training or experience that would qualify her as an expert in the fields of engineering specific to bolting/fastener design/technologies, metallurgy, fracture analysis in bolting components, coatings (over carbon steel surfaces), destructive and/or nondestructive testing technologies upon which to base her opinions." (Appellant's Brief at 19). Appellant claims Ms. Deye improperly used her "expert" status to bolster what is essentially "lay" testimony, based on nothing more than speculation and photographs and witness testimony, which the jurors could have evaluated for themselves. Appellant indicates that Ms. Deye concludes that the grate failed due to over-torquing and the failure to clean lag holes by the defendants. Appellant insists this testimony overreaches the scope of architecture and opines on matters better suited for an engineer. Appellant concludes the court erroneously admitted Ms. Deye's testimony, and this Court must remand for a new trial.[8] We disagree.

"The admission of expert testimony is a matter committed to the discretion of the trial court and will not be disturbed absent an abuse of that discretion." ***Nobles v. Staples, Inc.***, 150 A.3d 110, 113 (Pa.Super. 2016). "An abuse of discretion is not merely an error of judgment, but if in reaching

---

[8] Notwithstanding the phrasing of Appellant's third issue in the statement of questions presented, Appellant makes no argument on appeal that Ms. Deye testified beyond the scope of her written report.

a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Id.* (internal citation and quotation marks omitted).

Pennsylvania Rule of Evidence 702 permits expert testimony on subjects concerning knowledge beyond that possessed by a layperson. *See* Pa.R.E. 702. "It is the job of the trial court to assess the expert's testimony to determine whether the expert's testimony reflects the application of expertise or strays into matters of common knowledge." *Snizavich v. Rohm and Hass Company*, 83 A.3d 191, 194 (Pa.Super. 2013). "Admissible expert testimony that reflects the application of expertise requires more than simply having an expert offer a lay opinion." *Id.* at 195. "[E]xpert testimony must be based on more than mere personal belief, and must be supported by reference to facts, testimony or empirical data." *Id.* (internal citations and quotation marks omitted).

Instantly, the trial court explained:

> [Appellant] further challenges that the expert was merely an Architect "but has no specialized training or experience that would qualify her as an expert in the fields of engineering specific to bolting/fastener design/technologies/metallurgy, fracture analysis…" This argument ignores that [Appellant's] pre-trial Motion *in Limine* did not challenge Ms. Deye's **qualifications** to render an opinion, only that her opinion was not based on sufficient facts. Nor did [Appellant] challenge Ms. Deye's

- 16 -

qualifications at trial or request a ***Frye***[9] hearing. [Appellant] cannot now make objections that were waived before and during the trial. …

(Trial Court Opinion at 12-13) (emphasis in original).

Our review of the record confirms that Appellant did not challenge Ms. Deye's qualifications in its motion *in limine*. To the contrary, Appellant's motion *in limine* sought to preclude Ms. Deye's testimony based on the fact that Ms. Deye had not inspected the actual window grate.[10] Thus, Appellant argued that Ms. Deye's proffered testimony was speculation and conjecture. As the trial court noted, Appellant did not claim in the motion *in limine* that Ms. Deye's experience as an architect rendered her unqualified to give expert testimony in this case. (***See*** Motion *in Limine*, filed 4/26/22, at ¶¶ 1-24; R.R. at 50a-54a).

Nevertheless, Appellant did object to Ms. Deye's qualifications at trial. Specifically, following *voir dire* of Ms. Deye, Appellant's counsel stated: "I don't think the qualifications she discussed qualify her to discuss the material's failure of the grates in question." (N.T. Trial, 6/28/22, at 29; R.R. at 988a). The court overruled Appellant's objection. (***Id.***) Thus, we disagree with the trial court's statement that Appellant failed to object to Ms. Deye's

---

[9] ***Frye v. United States***, 293 F. 1013 (D.C.Cir. 1923).

[10] The window grate was not available for inspection.

- 17 -

qualifications during trial.[11]

Regarding her qualifications, Ms. Deye testified that she received her Bachelor of Science degree in architecture from Spring Garden College. Ms. Deye went on to the University of Illinois and completed a master's degree program in architecture. She then had a three-year internship and completed an examination in mechanical structural electrical site, civil and history. Ms. Deye also continues to complete continuing education courses that involve masonry, masonry construction, the structural capabilities that are required by building facades as well as components that are attached to them. Ms. Deye is a member of the American Institute of Architects and the National Accreditation Review Board of Architects. Ms. Deye is also an ice and snow expert and tribometer expert for slip resistance. Ms. Deye explained she has been doing project construction her whole life. (*Id.* at 19-22; R.R. at 978a-981a).

Upon *voir dire* cross-examination, Ms. Deye conceded that she does not have a degree in mechanical engineering. Nevertheless, Ms. Deye confirmed that she has studied metallurgy (a branch of science and technology concerned with the properties of metals and their production and purification). Ms. Deye explained that as an architect, she hires the mechanical, electrical and structural engineers and guides them through the process of what she

---

[11] Appellant also objected to Ms. Deye's qualifications in its post-trial motion. (*See* Post-Trial Motion, filed 7/11/22, at ¶ 40; R.R. at 684a).

likes to see in a building. Thus, "[i]t is [Ms. Deye's] job as a whole to understand and to make sure that what they're providing works with the overall building. So [she] has to understand everything they do. And [she] actually guide[s] them and [they] work together." (*Id.* at 24; R.R. at 983a).

Over Appellant's objection, the court accepted Ms. Deye as an expert in architectural safety. (*Id.* at 29; R.R. at 988a). Notably, Appellant failed to present any rebuttal expert witness to contradict Ms. Deye's conclusions or to opine that Ms. Deye was testifying beyond the scope of her expertise. On this record, we see no reason to disrupt the court's decision to accept Ms. Deye as a liability expert in this case. *See Snizavich, supra*; *Nobles, supra*.

Further, Ms. Deye explained that she reviewed the photographic evidence, the deposition testimony of various witnesses, the contracts with the engineer, the project punch list as well as the Philadelphia certification and approval dates, and Appellant's answers to interrogatories, in formulating her opinion in this case. (*See* N.T., 6/28/22, at 22; R.R. at 981a). Ms. Deye confirmed that "[b]ased on [her] education, training and experience, … the information provided to [her was] adequate for [her] to perform the review of this particular matter." (*Id.*) Thus, we disagree with Appellant's contention that Ms. Deye's opinion was based on mere speculation or conjecture. *See Snizavich, supra*. Therefore, Appellant's third issue merits no relief. Accordingly, we affirm.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/6/2023