J-A10038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| UPSILON CHAPTER, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREEK HOUSING SERVICES, INC. | : | |
| AND MARK MALONEY | : | |
| | : | |
| Appellants | : | No. 388 MDA 2021 |

Appeal from the Judgment Entered March 23, 2021
In the Court of Common Pleas of Centre County
Civil Division at No(s): 2016-4487

| | | |
|---|---|---|
| UPSILON CHAPTER, INC. AND 328 | : | IN THE SUPERIOR COURT OF |
| FAIRMOUNT, LP | : | PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREEK HOUSING SERVICES, INC. | : | |
| AND MARK MALONEY | : | No. 464 MDA 2021 |

Appeal from the Judgment Entered March 23, 2021
In the Court of Common Pleas of Centre County
Civil Division at No(s): 2016-4487

BEFORE: PANELLA, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED: MARCH 27, 2023**

Appellants/Cross-Appellees, Greek Housing Services, Inc. ("GHS") and Mark Maloney ("Maloney") (collectively, "Appellants"), appeal from the judgment entered in the Centre County Court of Common Pleas, in favor of

Appellee/Cross-Appellant, Upsilon Chapter, Inc. ("Upsilon").[1]  We affirm.

The relevant facts and procedural history of these appeals are as follows. Appellee Upsilon is a group of Alpha Sigma Phi alumni.  Appellant GHS is a property management company.  In 2004, Upsilon and GHS formed the Partnership to jointly purchase property at 328 Fairmount Avenue in State College, Pennsylvania.  The property has historically been used as a fraternity house for Alpha Sigma Phi members, and the purpose of the Partnership was to manage the property, including student leases.  GHS is the general partner and holds a 1% interest in the Partnership.  Upsilon is a limited partner and holds a 19% interest in the Partnership.  Appellant Maloney is a limited partner and holds an 80% interest in the Partnership.  Maloney is also an owner of GHS.

Upsilon filed the relevant amended complaint against Appellants in December 2017,[2] alleging breach of fiduciary duty/duty of finest loyalty; breach of partnership agreement; fraudulent transfers in violation of the

_____

[1] Upsilon filed its cross-appeal in its own right and, derivatively, on behalf of 328 Fairmount LP ("the Partnership"), as its minority partner.

[2] Upsilon originally filed two separate underlying lawsuits.  Upsilon filed the first suit on July 19, 2016 against GHS only, at docket No. 2016-2699, alleging breach of fiduciary duty, breach of contract (Partnership Agreement), and breach of contract (Leases).  Upsilon filed the second suit on December 6, 2016 against both Appellants, at docket No. 2016-4487, alleging breach of fiduciary duty, breach of contract (Partnership Agreement), conversion, and fraud.  On July 11, 2017, Upsilon filed an unopposed motion to consolidate the two actions, which the court granted on July 17, 2017.

Pennsylvania Uniform Fraudulent Transfer Act at 12 Pa.C.S.A. §§ 5101, *et seq.*; common law fraud; conversion; and seeking an action for accounting. Upsilon alleged, *inter alila*, that Appellants fraudulently transferred Partnership funds to Maloney through "sham" promissory notes, issued by third-party entities that Maloney owns and controls. According to Upsilon, Appellants refused to provide accounting information regarding the Partnership. Upsilon claimed Appellants mismanaged the property, forged leases, and failed to pay necessary taxes. Upsilon further averred that Appellants have not paid out any Partnership profits to Upsilon since the beginning of the Partnership.

Upsilon made its first request for production of documents from Appellants in the form of accounting records. Upsilon sought, *inter alia*, all accounting records from 2004 through the present pertaining to (a) Maloney; (b) GHS; (c) Half Moon Land Co.; (d) Maloney & Associates; and (e) MCM Property Management Group. The entities listed in (c) through (e) had borrowed money from the Partnership by way of promissory notes, which Upsilon alleged were fraudulent transfers to Maloney's "alter-egos."

On December 15, 2017, Upsilon filed a motion to compel, alleging that Appellants had failed to respond fully and completely to its interrogatories and request for production of documents. The court entered an order on February 7, 2018, granting in part and denying in part, Upsilon's motion to compel. Specifically, the court directed Appellants' full and complete production of the

requested documents in their native QuickBooks format within 45 days. The order stated that Appellants were not compelled to produce information or documents concerning nonparties except 328 Fairmount LP (the Partnership). (*See* Order, filed 2/7/18, at 1-2; R.R. at 510a-511a).

On April 10, 2018, Appellants filed a motion to join Alpha Sigma Phi as an indispensable party. Appellants claimed that Upsilon raised numerous allegations relating to the fraternity, including claims that Appellants took artifacts belonging to the fraternity and that Appellants damaged the fraternity's reputation. Appellants asserted that the fraternity's interests were so intertwined with the facts of this case and the relief sought such that it should be joined as a party to the action. Upsilon filed a response in opposition to Appellants' motion on May 14, 2018. On June 8, 2018, the court denied Appellants' motion to join.

On September 28, 2018, Upsilon filed a second motion to compel. In it, Upsilon sought the production of the complete contents of a binder relating to the Partnership as testified to by Appellants' accountant during his deposition. Additionally, Upsilon sought the accounting records for GHS, which the court had previously ordered Appellants to disclose in their native QuickBooks format. Upsilon alleged that the only accounting records that Appellants had produced so far related to the Partnership and not GHS. As GHS is a named party to the action, Upsilon claimed that Appellants were required to disclose GHS' accounting records consistent with the court's February 7, 2018 order.

Thus, Upsilon sought to enforce the prior court order.

On November 1, 2018, the parties entered a stipulated order, signed by the court, stating: "[Appellants] shall, within 14 days, produce the Quick[B]ooks files for [GHS], in their native format[,]" directing Appellants to produce the entire contents of the binder relating to the Partnership, and further indicating the appropriateness of discovery sanctions if Appellants again failed to comply. (**See** Stipulated Order, filed 11/1/18, at 1; R.R. at 761a).

On November 30, 2018, Upsilon filed a motion for discovery sanctions, claiming Appellants had not complied with the stipulated order. Upsilon argued that defense counsel produced a file, but the file was merely an updated version of the previously produced records, and it did not include the GHS QuickBooks file as directed in the stipulated order.

Appellants then filed a motion seeking to amend the stipulated order, claiming a dispute arose among the parties regarding the scope of the QuickBooks files to be disclosed. Appellants asked the court to clarify that they were not ordered to produce information concerning nonparties. Essentially, Appellants had not disclosed the GHS QuickBooks file because Appellants claimed that file showed financial transactions between GHS and nonparties, which Appellants insisted were confidential and irrelevant to the current action.

Upsilon filed a response in opposition, clarifying that it was seeking only

GHS' accounting records in their native QuickBooks format, and not accounting records of nonparties. Because GHS is a party to the action, Upsilon claimed its accounting records were discoverable and highly relevant.

The court held a hearing on Upsilon's motion for sanctions on January 22, 2019. Appellants insisted that the only portions of the QuickBooks files they had not turned over related to other fraternities that were nonparties to the action, and were "proprietary" and irrelevant to the case. Appellants maintained they interpreted the stipulated order as Upsilon seeking only updated QuickBooks information and not any information related to unrelated entities.

On January 24, 2019, the court ordered Appellants to produce all GHS accounting records from 2016 and 2017 in their entirety and in their native QuickBooks format within 20 days. (**See** Order, filed 1/24/19, at 1; R.R. at 858a). Appellants subsequently filed a notice of appeal, to which Upsilon filed a cross-appeal.[3] Thereafter, this Court quashed both appeals as interlocutory. In quashing Appellants' appeal as interlocutory, this Court rejected Appellants' claim that the January 24, 2019 order was immediately appealable under the collateral order doctrine. This Court stated that Appellants' attempt to label the accounting information sought as something distinct from the merits of the case was disingenuous given Upsilon's claims alleging the fraudulent

_____

[3] In response to a rule to show cause, Upsilon conceded that its cross-appeal was interlocutory and should be quashed.

transfer of funds to the Maloney-controlled nonparties. *See Upsilon Chapter, Inc. v. Greek Housing Services, Inc.*, No. 564 MDA 2019 (Pa.Super. filed Nov. 19, 2019) (unpublished memorandum). Moreover, this Court held that Appellants failed to demonstrate that the Court could consider the propriety of the discovery ordered without consideration of Upsilon's underlying claims. *See id.*

On November 27, 2019, Upsilon filed a motion for reconsideration of the two-year time limitation set forth in the January 24, 2019 order, where the court had only compelled discovery of records for 2016 and 2017. The court granted Upsilon's motion the next day, directing Appellants to fully and completely produce the GHS accounting records from 2004 to 2017 in their entirety and in their native QuickBooks format within 20 days. The order made clear that Appellants were not required to produce information or documents concerning nonparties other than 328 Fairmount LP (the Partnership). (*See* Order, filed 11/28/19, at 1).[4]

On March 10, 2020, Upsilon filed a renewed motion for discovery sanctions, insisting that Appellants still had not complied with the court's discovery orders. The court held a status conference on March 18, 2020.[5]

---

[4] This order is in the certified record but was not included in the reproduced record.

[5] According to Upsilon, the court expressly rejected Appellants' characterization of the discovery orders at the status conference and
*(Footnote Continued Next Page)*

Upsilon filed an additional motion for discovery sanctions on May 15, 2020. The court held a hearing on the motions for sanctions on June 17, 2020. At the hearing, Upsilon introduced testimony from Joel Valentine, a certified public accountant ("CPA"), to discuss the discrepancies and omissions in the documents produced by Appellants.

By order dated June 25, 2020, and filed the next day, the court granted Upsilon's motion and entered a default judgment against Appellants based on their failure to comply with the relevant discovery orders. Following a hearing on October 15, 2020, the court awarded damages in favor of Upsilon in the amount of $846,555.00. The court denied Upsilon's request for punitive damages. Both parties subsequently filed post-trial motions.

Upsilon filed a petition for counsel fees on March 11, 2021, seeking $119,746.00. The court scheduled a hearing on the fee petition for March 22, 2021. On March 17, 2021, Appellants filed a motion to continue the hearing, seeking a 30-day continuance to review the reasonableness of the fees alleged in the petition. The court denied Appellants' continuance request and held the

_____

reiterated Appellants' obligation to produce the entire GHS accounting file in its native QuickBooks format. The court directed the parties to attempt to resolve the issue following the status conference, but Appellants still refused to produce the requested discovery. There are no notes of testimony from the status conference, but the record supports Upsilon's version of events. Specifically, the trial court opinion states: "A hearing was held on March 18, 2020, during which [Upsilon] and the [c]ourt emphasized the discoverability regarding [GHS'] accounting records, stating any limitation regarding a 'non-party' disclosure certainly did not make [GHS'] own accounting records undiscoverable." (Opinion and Order, filed 6/26/20, at 2; R.R. at 1555a).

hearing as scheduled on March 22, 2021. The court also heard argument on the parties' respective post-trial motions. Following the hearing, the court denied both parties' post-trial motions and granted Upsilon's fee petition for the amount sought. The next day, Appellants filed a *praecipe* to enter judgment, and judgment was entered in favor of Upsilon in the amount of $966,301.00, plus applicable interest and costs.

Appellants timely filed a notice of appeal on March 24, 2021. On April 7, 2021, Upsilon timely filed a cross-appeal. Thereafter, the court ordered the parties to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellants complied on April 20, 2021, and Upsilon complied on April 29, 2021.

Appellants raise the following five issues for our review:

> Whether, under Pennsylvania Rule of Civil Procedure 4019, the trial court properly entered default judgment against Appellants for failing to disclose accounting information relating to nonparties, when the trial court's discovery orders repeatedly stated that Appellants were not required to disclose that information; Appellants, therefore, did not violate any discovery orders or demonstrate bad faith; Appellants, in any event, disclosed all of the relevant financial records; and, as a result, [Upsilon] was able to comprehensively calculate its alleged damages at the resulting damages trial, without any need for additional discovery responses.
>
> Whether the trial court properly entered a default judgment award for $846,555, when that award violates established legal tenets like statutory limitations periods, the award exceeds what [Upsilon] sought and presented at trial, and the award indisputably contradicts the weight of the evidence.

Whether the trial court properly denied a motion to continue the hearing date for reviewing an attorneys' fees and costs petition, when the petition disclosed more than 1,500 time entries, the trial court scheduled the hearing just six days after the date of the petition's filing and six days before the hearing, and the opposing counsel filed a timely and justified motion to continue the hearing.

Whether the trial court properly entered an attorneys' fees and costs award for $119,746, when that award grants, in toto, the moving party's requested relief without reviewing the attorney time and costs entries, and the opposing party has highlighted unjustifiable line entries like spending more than ten times the length of trial on the drafting of proposed findings of fact and conclusions of law.

Whether the trial court properly refused to join as an indispensable party a fraternity group [Alpha Sigma Phi], when [Upsilon], an alumni group affiliated with the fraternity, was seeking relief on behalf of the fraternity group, including conversion for certain of the fraternity group's assets, in its pleadings.

(Appellants' Brief at 8-10).[6]

In its cross-appeal, Upsilon raises a single issue for our review:

When the Honorable Trial Court entered default judgment against Appellants, the allegations of Upsilon's Complaint were conclusively deemed admitted. Those deemed admissions established that Appellants defrauded Upsilon— their partner—and the Partnership and converted their assets. Did the Trial Court abuse its discretion by refusing to award Upsilon punitive damages to punish and deter such conduct?

_____

[6] We have reordered some of Appellants' issues to more closely track how they are argued in Appellants' brief. We note that Appellants' third and fourth issues as phrased in the statement of questions presented are combined under section (C) in Appellants' argument section. Although our Rules of Appellate Procedure mandate that an argument section be divided into as many parts as there are questions to be argued (*see* Pa.R.A.P. 2119(a)), this defect does not impede our review.

(Upsilon's Brief at 10).

In their first issue, Appellants argue that they did not commit a discovery violation. Appellants insist they did not disclose non-party information, consistent with the court's discovery orders. Appellants claim they could not have acted in bad faith where they complied with the trial court's directives. Appellants stress that they only withheld financial information relating to tenants of other fraternity houses and their guarantors, having no relevancy to this case. Even if they committed a discovery violation, Appellants maintain that Upsilon did not suffer any prejudice resulting from such a violation. Appellants contend that Upsilon's expert at the damages hearing fully testified on relevant issues concerning whether Appellants took money from the Partnership and Upsilon, and how much. Appellants submit that how the money was used by Appellants or other third-parties has no bearing on Upsilon's claims, and Upsilon was not prejudiced by not knowing those facts. Appellants conclude the trial court erred by entering a default judgment in this case, and this Court must grant relief.[7] We disagree.

_____

[7] We note that Appellants cite **Mancini v. Concorde Grp.**, No. 2233 EDA 2013 (Pa.Super. filed Sept. 25, 2014) (unpublished memorandum), regarding the trial court's alleged failure to consider certain factors relevant to entry of a default judgment as a discovery sanction. (**See** Appellants' Brief at 53 n.17). Nevertheless, a party may only cite to unpublished decisions of this Court filed **after** May 1, 2019 for their persuasive value. **See** Pa.R.A.P. 126(b). Consequently, we will not consider Appellants' reliance on **Mancini**, decided in 2014, when conducting our review.

Pennsylvania Rule of Civil Procedure 4019 permits the trial court to enter a default judgment against a defendant who fails to comply with discovery orders. *See* Pa.R.C.P. 4019(c)(3). This Court has explained:

> Generally, imposition of sanctions for a party's failure to comply with discovery is subject to the discretion of the trial court, as is the severity of the sanctions imposed. Nevertheless, the court's discretion is not unfettered: because dismissal is the most severe sanction, it should be imposed only in extreme circumstances, and a trial court is required to balance the equities carefully and dismiss only where **the violation of the discovery rules is willful** and the opposing party has been prejudiced. Consequently, where a discovery sanction either terminates the action directly or would result in its termination by operation of law, the court must consider multiple factors balanced against the necessity of the sanction.

*Rohm and Haas Co. v. Lin*, 992 A.2d 132, 142 (Pa.Super. 2010), *cert. denied*, 565 U.S. 1093, 132 S.Ct. 852, 181 L.Ed.2d 550 (2011) (internal citations and quotation marks omitted) (emphasis in original). "Absent a finding that the trial court abused its discretion, this Court will not reverse an order sanctioning a party which the trial court found necessary and proper." *Croydon Plastics Co., Inc. v. Lower Bucks Cooling & Heating*, 698 A.2d 625, 629 (Pa.Super. 1997), *appeal denied*, 553 Pa. 689, 717 A.2d 1028 (1998).

In determining whether default judgment as a discovery sanction is appropriate, the following factors are to be considered: "(1) the nature and severity of the discovery violation; (2) the defaulting party's willfulness or bad faith; (3) prejudice to the opposing party; (4) the ability to cure the prejudice;

and (5) the importance of the precluded evidence in light of the failure to comply." ***Rohm and Haas Co., supra***. Importantly, "each factor represents a necessary consideration, not a necessary prerequisite." ***Id.***

Instantly, the trial court discussed Mr. Valentine's testimony at the June 17, 2020 hearing on Upsilon's motion for sanctions as follows:

> [Joel] Valentine testified to primarily dealing in issues of fraudulent reporting and misappropriation, which he stated often go hand in hand. He then detailed the contents of each QuickBooks…file provided to [Upsilon] by [Appellants], which all contained only general ledgers from [the Partnership], and explained the impossibility of determining what happened to certain funds transferred to GHS. In total, Valentine reviewed [QuickBooks] files spanning from September of 2018 to the most recent, which was submitted on June 16, 2020, one day before the hearing on [Upsilon's motion for sanctions]. According to the testimony, each subsequent [QuickBooks] file briefly expounded upon the last, but only to the extent of certain journal entries regarding tax returns and other irrelevant transactions, which are indisputably of no significance to the present matter. Valentine then testified to each file being the same "base file" and simply a regurgitation of the same data specific to [the Partnership], which does not provide a complete picture or even detail how or where GHS used the funds. Specifically, Valentine stated, "It is clear the money was diverted from 328 to [GHS]," but the "why or what" is not.
>
> Valentine also emphasized on cross-examination the GHS accounting records in their entirety are what is required to complete the picture. He stated this does not necessarily have to include social security numbers, contrary to the argument continually advanced by defense counsel despite numerous explanations and resolutions provided by opposing counsel and this [c]ourt.

(Opinion and Order, filed 6/26/20, at 3; R.R. at 1556a).

Against this backdrop, the trial court explained why entry of default

- 13 -

judgment as a discovery sanction was necessary:

> First, it is clear from the record [Upsilon] has been severely prejudiced by [Appellants'] failure to comply with the discovery requests, not only by suffering extreme delay and costs in attorney's fees, but also in withholding information which is of the utmost importance to the merits of their underlying claim. The first request for production for the accounting records served upon GHS was in 2017, nearly three years ago. The first motion to compel production was granted in part by this [c]ourt on February 7, 2018, directing GHS to "fully and completely respond to the Request for Production of Documents Nos. 3, 4, 5, 6, and 12…" subject only to [Appellants] not being compelled "to produce information or documentation concerning nonparties except [the Partnership]." Over two years later, in contradiction to this [c]ourt's orders and necessitating copious amounts of attorney's fees to be incurred by [Upsilon], [Appellants] still have not produced the accounting records on the idea that they are [confused by the orders].
>
> Next, and as to whether such prejudice suffered by [Upsilon] can be cured, the [c]ourt finds to be of great significance [Appellants'] expression at the most recent hearing on the motion of no intention of future compliance. Quite the opposite, [Appellants] continue to maintain the information being sought is not discoverable, which has already been ruled on by this [c]ourt and re-emphasized at the most recent status conference on March 18, 2020. Alternatively, [Appellants] claim ignorance regarding this [c]ourt's Orders directing production of [GHS'] accounting records in large part due to the [c]ourt's use of the term "non-party" in the most recent order. As explained by this [c]ourt to defense counsel at the status conference, and which will be explained in greater detail to follow, use of the phrase "non-party" does not preclude discovery of [GHS'] **own** accounting records. While the [c]ourt certainly understands the **potential** privacy interest at hand, the relevancy of the materials sought cannot be disputed. Further, Valentine re-emphasized little to no risk in securing any confidential or private information regarding non-parties, and of particular importance, detailed the engagement letter between [Upsilon] and himself, which precluded the possibility of divulging any such information, even if somehow acquired.

- 14 -

The [c]ourt notes it has never before witnessed a case of such extreme delay and belabored arguments of confusion in response to a basic discovery order. This is particularly so given the undisputed relevancy of the information, the lack of any proprietary nature continually explained, and its necessity in resolving the merits of the underlying action. … As [Upsilon] correctly points out in its brief in support of the motion for sanctions, "the evidence concealed by the Alter Ego Defendants is relevant to a fraudulent transfer analysis, may ultimately result in the avoidance of certain transfers in collecting any judgment against Defendants, **and goes directly to [GHS'] asserted defense** that they had legitimate reasons for taking over one million ($1,000,000.00) of the partnership's money."

… [Appellants] cannot claim repeated confusion by an unequivocal directive, which has been explained at length by both [Upsilon] and this [c]ourt, in an attempt to mask what can only be ascertained to mean willful noncompliance.

…[T]he [c]ourt finds [Appellants] did act willfully and severely in violation of discovery rules and this [c]ourt's prior Orders, making default judgment the only appropriate remedy. To be sure, where the discovery sanction imposed is tantamount to dismissal of the underlying action, such as default judgment, the violation must have been willful, or in bad faith. …

As previously stated, [Appellants], by and through their counsel of record, would like the [c]ourt to accept their continued insistence of "profound confusion" despite four Court Orders, followed by numerous instances of clarification provided by the [c]ourt. It cannot. While the apparent need for such clarification was likely insincere from the start, any remaining alleged mystification can only logically be rooted in bad faith and for the sole purpose of delaying [Upsilon's] ability to be compensated in any way or amount. Given [Appellants'] continued and blatant disregard for several of this [c]ourt's previous Orders directing production of [GHS'] accounting records, the [c]ourt finds default judgment should appropriately be entered against [Appellants], and is in fact the only remaining course of action to be taken. …

[H]ere, [Appellants] were given more than ample opportunity to comply with the discovery requests and this [c]ourt's numerous Orders directing production. In what can only be labeled as an attempt to delay [Upsilon's] ability to proceed to trial on the merits of their claim, [Appellants] chose to ignore this [c]ourt's directives and maintain a façade of puzzlement. This is certainly not to say genuine confusion by a court order will necessarily lead to discovery sanctions in the form of default judgment. Rather, importantly, this [c]ourt emphasizes its repeated clarification of an Order to which any reasonable person would interpret as directing the production of the accounting records of [GHS]. As [Upsilon] correctly noted at the hearing on this matter, it is illogical to stand by the notion that simply because [GHS] engaged in transactions with certain non-parties, such as some of Mark Maloney's other unrelated business entities, such transactions become undiscoverable. Again, assuming [Appellants] stood in a position of genuine confusion by the wording of these prior Orders, such confusion was laid to rest by this [c]ourt clearly and unequivocally long ago. Thus, any future attempt to evade the same could only have been motivated by the desire to delay the proceedings and foreclose [Upsilon's] ability to be compensated. …

Lastly, and significantly, the [c]ourt notes the lengthy history of [Appellants'] noncompliance. Even affording a benefit to [Appellants] by accepting their initial alleged perplexity as honest and genuine, the failure to comply following this [c]ourt's clarification is inexcusable. [Appellants] should not be permitted to escape sanction by continuing to blindly allege bewilderment with this [c]ourt's extremely straight-forward Orders, reinforced by [Upsilon's] correct assertions in motions, status conferences and during oral argument. [Appellants have] refused to provide the relevant discovery materials throughout the entire history of this case, and showed no intention of complying in the future at the hearing on the instant motion. The [c]ourt, therefore, believes it [had] no choice but to impose the requested sanction in the form of default judgment.

(*Id.* at 3-8; R.R. at 1557a-1561a) (emphasis in original) (internal citations

omitted). The record supports the court's analysis.

Although Appellants contend that they did not violate any of the court's discovery orders because they did not turn over "non-party" information, the record confirms the court directed Appellants on multiple occasions to produce **GHS' accounting records**, as GHS is a party to the litigation. The court rejected Appellants' "misinterpretation" of the court orders and made clear at the March 18, 2020 status conference that any limitation regarding a "non-party" disclosure did not make GHS' own accounting records undiscoverable. Appellants explained the crux of their argument at the June 17, 2020 hearing, stating: "Let's assume for the sake of this argument that [GHS] took too much money from the partnership. Why would it ever be admissible at a trial what they then did with it, whether they bought groceries or anything else? It just doesn't matter." (N.T. Hearing, 6/17/20, at 33; R.R. at 3050a).[8] Nevertheless, Appellants' belief that the discovery orders wrongly permitted discovery of "proprietary" or "irrelevant" non-party information does not excuse their non-compliance. *See, e.g., Luszcznski v. Bradley*, 729 A.2d 83, 87 (Pa.Super. 1999) (stating party's belief that discovery orders are wrong does not justify or excuse its violation of those orders; rather, such defiance

---

[8] Upsilon responded to this argument explaining that it needs to know where the money goes after GHS transfers it from the Partnership account because: (1) part of it is Upsilon's money and Upsilon needs to know where that money goes when they try to collect it; and (2) to rebut GHS' defense that the loans at issue were for legitimate business expenses. (*See id.* at 38; R.R. at 3055a).

is direct affront to authority of trial court and to integrity of judicial system and rule of law). This Court quashed Appellants' appeal challenging the discovery order as interlocutory. Appellants could have disclosed the allegedly proprietary and irrelevant information and challenged the court's order following a final judgment on the merits in this case. Instead, Appellants stood firm in their position not to turn over GHS' accounting records.

As the trial court correctly noted, Appellants have failed to comply with four discovery orders (filed February 7, 2018, November 1, 2018, January 24, 2019, and November 28, 2019, respectively). The orders compelled Appellants to produce GHS' accounting records in their native QuickBooks format time and time again; Appellants refused to comply. The court's analysis as set forth above makes clear the court considered each of the factors relevant to entry of default judgment prior to imposing that discovery sanction. *See Rohm and Haas Co., supra*. On this record, we see no abuse of discretion in the court's entry of default judgment as a discovery sanction. *See Croydon, supra*. Thus, Appellants' first issue merits no relief.

In their second issue, Appellants assert that Upsilon's expert, Mr. Valentine, testified to the amount of damages. In his calculations, Mr. Valentine opined that Appellants owed $2,775,980.00 to the Partnership, and that Upsilon was entitled to 19% of that amount, which is $527,436.00. Appellants contend that the $527,436.00 figure included $375,865.00 of "rental income not deposited." Appellants claim the court accepted Mr.

Valentine's testimony and awarded the "rental income not deposited" amount as compensatory damages. Appellants submit that, even if valid, that amount should have constituted derivative damages (as the money was owed to the Partnership), not direct compensatory damages to Upsilon. Further, Appellants insist the trial court double counted the "rental income not deposited" amount, because the court had already factored that amount into the derivative damages calculation—the court could not award the same amount as both compensatory and derivative damages.

Appellants further argue that Mr. Valentine's calculations were not credible. Regarding the "rental income not deposited" analysis, Appellants assert that Mr. Valentine made assumptions about how many individuals could have occupied the Partnership property and how much those individuals would have paid. Appellants contend Mr. Valentine then suggested that Appellants were responsible for the difference between what was deposited into the Partnership account as rental income and what Mr. Valentine speculated could have been deposited. Appellants submit Mr. Valentine's calculations were arbitrary and unsupported by evidence. Appellants emphasize that Mr. Valentine was not even reasonably certain about some of his calculations.

Additionally, Appellants aver that Mr. Valentine improperly considered all withdrawals by Appellants from the Partnership account as misappropriations even though many of the withdrawals were legitimate expenses such as management and maintenance fees. Appellants complain

Mr. Valentine is not a forensic accountant and was qualified only as a business valuation expert. Appellants contend that Mr. Valentine did not follow forensic accounting standards.

Appellants also allege the trial court inappropriately awarded damages dating back to 2004. Appellants maintain the court improperly rejected their statute of limitations defense, where Upsilon "opened the door" to this issue. Appellants claim Upsilon had accounting concerns back in 2010 but waited six years to file suit such that the discovery rule is inapplicable here. Appellants conclude the trial court's acceptance of Mr. Valentine's expert testimony and calculation of damages was erroneous, and this Court must grant relief. We disagree.

"The admission of expert testimony is a matter committed to the discretion of the trial court and will not be disturbed absent an abuse of that discretion." ***Nobles v. Staples, Inc.***, 150 A.3d 110, 113 (Pa.Super. 2016). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." ***Id.*** (internal citation and quotation marks omitted).

Pennsylvania Rule of Evidence 702 permits expert testimony on subjects concerning knowledge beyond that possessed by a layperson. ***See*** Pa.R.E. 702. "It is the job of the trial court to assess the expert's testimony to

determine whether the expert's testimony reflects the application of expertise or strays into matters of common knowledge." ***Snizavich v. Rohm and Hass Company***, 83 A.3d 191, 194 (Pa.Super. 2013). "Admissible expert testimony that reflects the application of expertise requires more than simply having an expert offer a lay opinion." ***Id.*** at 195. "[E]xpert testimony must be based on more than mere personal belief, and must be supported by reference to facts, testimony or empirical data." ***Id.*** (internal citations and quotation marks omitted).

Additionally, "[t]he duty of assessing damages is within the province of the [fact-finder] and, thus, as a general matter, a compensatory damage award should not be interfered with by the court unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." ***Paves v. Corson***, 569 Pa. 171, 175, 801 A.2d 546, 549 (2002) (internal citation and quotation marks omitted). "This standard incorporates the well-established requirement that a compensatory damage award must bear some reasonable relation to the loss suffered by the plaintiff as demonstrated by uncontroverted evidence at trial." ***Id.***

Instantly, we initially note that when Mr. Valentine testified at the June 17, 2020 hearing on Upsilon's motion for sanctions, Appellants stipulated to his credentials. (***See*** N.T., 6/17/20, at 5; R.R. at 3022a). At that hearing, Mr. Valentine testified that he is a CPA who provides audit and tax services as well as business valuations, fraud investigations, and a variety of other

- 21 -

consulting services including forensic accounting services. (*See id.* at 5-6; R.R. at 3022a-3023a). Mr. Valentine testified again at the October 15, 2020 damages hearing. At that time, Mr. Valentine explained that about 50% of his practice is in forensic accounting and valuation services. On cross-examination, however, Mr. Valentine admitted that he is not a certified forensic accountant. Consequently, Appellants objected to Mr. Valentine testifying as an expert in forensic accounting. (*See* N.T. Hearing, 10/15/20, at 35-36; R.R. at 2307a-2308a). The court sustained Appellants' objection and accepted Mr. Valentine as an expert in accounting and valuation. (*Id.* at 36; R.R. at 2308a).

Significantly, Appellants do not explain how someone with Mr. Valentine's experience and credentials is unable to offer expert testimony concerning the damages in this case. The fact that Mr. Valentine was not qualified as a forensic accounting expert did not necessarily render him unable to give opinions concerning the amount of money Appellants fraudulently took from the Partnership and the damages Upsilon and the Partnership incurred as a result, given Mr. Valentine's expertise in accounting and business valuation. Other than baldly asserting that this case is about forensic accounting and Mr. Valentine is not a forensic accountant (*see* Appellants' Brief at 67-68), Appellants provide no support for their claim that Mr. Valentine's testimony was inappropriate here. The court was free to reject the testimony of Appellants' expert that Mr. Valentine was testifying beyond

the scope of his area of expertise and accept Mr. Valentine's expert testimony. *See Devon Serv., LLC v. S&T Realty & Saul Barsh*, 171 A.3d 287, 292 (Pa.Super. 2017) (stating: "[I]t is the role of the trial court to weigh the credibility of testimony and evidence concerning valuation, including the weight to be given to expert testimony"). We see no reason to disrupt the court's acceptance of Mr. Valentine's expert testimony in this case.[9] *See Nobles, supra*.

Regarding the calculation of damages, the court reasoned:

> [Upsilon] is seeking $896,375.00 in direct compensatory and derivative compensatory damages plus treble punitive damages in the amount of $2,689,125.00 for a total amount of damages payable to [Upsilon] in the amount of $3,585,500.00 which amounts are disputed by [Appellants].
>
> \* \* \*
>
> Joel Valentine a [CPA] and CEO of Wessel and Company testified at the October 15 hearing on damages. He was accepted as an expert in the field of accounting and valuation. Mr. Valentine generated his first expert report on October 24, 2018. In preparing the October 24, 2018 report, he viewed the documents from the QuickBook[s] file for [the] Partnership (Exh. E-1), summarized transactions from related parties, reviewed the balance sheet and income statements, and the specifics of the account due from [GHS]

---

[9] The record belies Appellants' assertions that Mr. Valentine did not render his opinions to a reasonable degree of professional certainty. (*See* N.T., 10/15/20, at 32, 98; R.R. at 2304a, 2370a). Appellants seem to emphasize one portion of Mr. Valentine's 2018 report that used ambiguous language and described Appellants' "possible" fraud. Nevertheless, Mr. Valentine explained that as he reviewed discovery turned over after issuance of his 2018 report, and in light of the default judgment that conclusively established Appellants' fraud, Mr. Valentine had no doubt regarding the damages as calculated in his later reports. (*See id.* at 97-98; R.R. at 2369a-2370a).

to quantified amounts due to [the] Partnership. The Quick[B]ooks files spanned October 21, 2004 through December 31, 2017. Additionally, Mr. Valentine reviewed the pleadings and discovery materials. After review of the documents, Mr. Valentine concluded that $1,019,219.00 was transferred out of the partnership by Mr. Maloney and [GHS]. Interest and late fees calculated at six percent amount to $407,819. The total with principal, six percent interest, and late fee[s] was $1,427,038.00. Mr. Valentine testified that a 10 percent interest rate would be appropriate in comparing this matter to investments with similar risk profiles such as credit cards and he provided calculations at a 10 percent interest rate.

Additionally, Mr. Valentine testified to damages he calculated for rental revenue shortfall for the rental house of the Partnership. Mr. Valentine's revenue projections begin at page 45 of his October 2018 report and include a matrix for years 2005 through 2017. Mr. Valentine concluded the revenue shortfall for rental of the Partnership house was $375,765.00. Mr. Valentine testified regarding how he calculated the revenue shortfall; specifically, he used an occupancy rate of 85 percent and $6,500.00 as the yearly rental rate while considering collection issues as are typical. The [c]ourt found Mr. Valentine's testimony regarding the rental revenue shortfall credible and reasonable and based on the historical rental of the house, and therefore adopts his calculation of $375,000.00 for revenue shortfall.

Mr. Valentine prepared an addendum dated August 5, 2020 (Exh. J-2) to capture the calculations subsequent to the original report. For the addendum report, he reviewed an updated Quick[B]ooks file and a file titled "[GHS] ASP") ("ASP" set of books). The name of the file would suggest there is an entity, [GHS] ASP; however, Mr. Valentine testified it appeared to be a separate set of accounting books that some money was passed through, but there was no such legal entity. He reviewed the profit and loss comparison in the ASP set of books and there was a cumulative profit of $433,000.00. The payments over the time analyzed were $174,017.00 to GHS. Mr. Valentine testified that his review of the ASP set of books added further support to his conclusion of the rent shortfall being

$375,000.00. As of the August 5, 2020 updated report, Mr. Valentine calculated that [Appellants] owed the Partnership $2,775,980.00. Based on Upsilon's 19 percent interest, [Appellants] would owe to Upsilon $527,436.00. The calculations were contained in exhibit E attached to Mr. Valentine's report which was admitted into evidence as Exhibit J-2. On September 30, 2020, Mr. Valentine generated an additional report which solely was in response to defense expert David Duffus's report as discussed below.

[Appellants] presented the testimony of David Duffus a [CPA] employed by HKA. Mr. Duffus opined that the amount of principal was $995,579.00 which was about $25,000 less than Mr. Valentine's opinion. Mr. Duffus applied a 5% interest rate and did not apply the late fees of $25.00 per day. Mr. Duffus did not calculate any figure for rental income not deposited and felt Mr. Valentine based his figures on faulty assumptions. In sum, Mr. Duffus opined that [Appellants] owe $1,303,792.00 to the Partnership, of which $247,720.00 is owed to Upsilon based on its 19 percent interest.

The [c]ourt determines that compensatory damages in the amount of $846,555.00 are appropriate in this matter. The [c]ourt found Mr. Valentine's reports and testimony to be credible but found Mr. Duffus's report and testimony to be less thorough and less credible. Also, the report and testimony of Mr. Valentine which the [c]ourt found to be competent and credible establish that [Upsilon] is entitled to derivative damages. Although the [c]ourt could exceed the statutory interest rate as noted by [Upsilon] and Mr. Valentine provided figures for the application of a 10 percent interest rate, the [c]ourt declines to do so given the circumstances and evidence and will apply the 6 percent statutory interest rate.

(Opinion and Order, filed 2/23/21, at 3-6; R.R. at 1979a-1982a) (some record citations omitted).

The record supports the court's calculation of damages. Mr. Valentine testified that $1,019,219.00 was transferred from the Partnership to GHS

and/or Maloney's related entities. (*See* N.T. Hearing, 10/15/20, at 40; R.R. at 2312a). We agree with Upsilon that "[i]f [Mr.] Valentine was 'ill-prepared' to exclude…arguably-legitimate transactions from his calculations, Appellants have nobody to blame but themselves for withholding GHS' books." (Upsilon's Brief at 74).

Additionally, when calculating the "rent not deposited," Mr. Valentine looked at past leases to determine an "optimal" yearly figure the Partnership could generate from rental income. Mr. Valentine calculated that with 43 tenants as "achievable" and an 85% occupancy rate, with a $6,500/year rental rate per student, the Partnership could generate $238,000.00/year. Assuming an 85% collection rate, that amount reduces to approximately $200,000.00 of anticipated rental income/year. (*See id.* at 45-46; R.R. at 2317a-2318a). Mr. Valentine noted that in certain years the Partnership generated more than that amount. Nevertheless, given the inadequate property management—as alleged in the amended complaint and established based on the default judgment—many years generated less than that amount. Specifically, Upsilon had alleged that Appellants interfered with Partnership tenants, failed to maintain the property, and allowed it to fall into a state of disrepair. Thus, the "rent not deposited" shortfall was $375,865.00. (*Id.* at 45-48; R.R. at 2317a-2320a). Mr. Valentine's calculations were based on the facts and evidence of the history of rentals in this case. *See Snizavich, supra*. We cannot say that Mr. Valentine's calculations bore no reasonable

relation to the loss suffered here. **See Paves, supra**. Essentially, Appellants ask us to find their expert's testimony more credible than Mr. Valentine's testimony; we will not do so. **See Devon Serv., LLC, supra**.

With respect to Appellants' claim that the court "double counted" the "rent not deposited" amount, the court awarded $368,939.00 direct compensatory damages; and $477,616.00 derivative compensatory damages accounting for Upsilon's 19% interest in the Partnership, "inclusive of fraudulent transfers, interest at 6%, late fees, and rent not deposited." (**See** Order, filed 2/23/21; R.R. at 1983a). Appellants contend the court inappropriately counted the "rent not deposited" amount in both categories of damages. Upsilon insists the court's compensatory damages award was to compensate Upsilon for Appellants' unauthorized write-offs of Upsilon's capital account, based on Appellants' impermissible allocation of 100% of tenant obligations to Upsilon who was only a 19% partner.

Although the court did not detail its compensatory damages award, the record supports Upsilon's position. In its findings of fact and conclusions of law, Upsilon expressly sought $368,939.00 in compensatory damages where GHS eliminated Upsilon's Partnership capital account for tenant obligations that Upsilon did not agree to assume. (**See** Upsilon's Proposed Findings of Fact/Conclusions of Law, filed 12/2/20, at 81 ¶293; R.R. at 1646a). This is the exact amount the court awarded in compensatory damages to Upsilon. By contrast, the court expressly stated that the derivative damages calculation

included the "rent not deposited" amount (proportionate to Upsilon's 19% interest in the Partnership). Thus, we disagree with Appellants that the court "double counted" the "rent not deposited" analysis in both the compensatory and derivative damages categories.[10]

Regarding Appellants' statute of limitations claim, Appellants purported to raise this defense during opening arguments at the damages hearing. (**See** N.T., 10/15/20, at 19; R.R. at 2291a). Appellants raised the issue again during cross-examination of Mr. Valentine. (**See id.** at 77-78; R.R. at 2349a-2350a). In response, Upsilon noted that Appellants were trying to "tee up" a statute of limitations defense and sought to elicit testimony to explain why the statute of limitations would be tolled, to the extent Appellants were even able to assert that defense at this juncture. (**Id.** at 120; R.R. at 2392a). The court stated that it would let both parties proceed and "course it out at the end." (**Id.** at 124; R.R. at 2396a). On this record, we cannot agree with Appellants that Upsilon "opened the door" to the statute of limitations issue.

Moreover, our Supreme Court explained that where a default judgment is entered against a party as a discovery sanction, any defenses to the action

---

[10] To be sure, Mr. Valentine testified that the "rent not deposited" amount was $375,865.00. The court made clear in its opinion that it was accepting Mr. Valentine's "rent not deposited" analysis. As this amount exceeds the compensatory damages awarded, the compensatory damages award does not reflect the "rent not deposited" amount. To the extent Appellants claim the variance is due to the court's application of a 6% interest rate as opposed to the 10% interest rate suggested by Mr. Valentine, we note that the $375,865.00 figure was a pre-interest figure.

are "effectively abandoned." *Fox v. Gabler*, 534 Pa. 185, 626 A.2d 1143 (1993) (holding that once default judgment was entered against appellee for disobedience to discovery orders, appellee effectively abandoned claim that contract at issue was illegal). As the trial court noted, "the statute of limitations is a waiveable affirmative defense which [Appellants are] foreclosed from asserting at this juncture. The statute of limitations affirmative defense is intended to defeat, in whole or part, [Upsilon's] asserted right of recover[y] and under *Fox*[*, supra*] the affirmative defense is foreclosed…at this juncture after the entry of default judgment." (Opinion and Order, filed 2/23/21, at 3; R.R. at 1979a). We agree with the trial court's reasoning.[11] Therefore, Appellants' second issue merits no relief.

_____

[11] Appellant's reliance on *Williams v. Pepsi-Cola Metropolitan Bottling Co., Inc.*, 362 A.2d 314 (Pa.Super. 1976) is misplaced. In that case, a default judgment was entered against the defendant Pepsi on December 4, 1970. Thereafter, **both** parties proceeded with litigation as if no default judgment had been entered. The case proceeded to trial, and the plaintiff did not object to the court hearing testimony/evidence on both negligence and damages, instead of just damages. On appeal, this Court held that even though it was error for the trial court to consider issues other than the amount of damages at trial, "we cannot grant a new trial based thereon where no objection was voiced below at trial or on his motion for a new trial." *Id.* at 316.

Here, as explained above, Appellants brought up the statute of limitations issue several times during the damages hearing. Upsilon made clear throughout the proceedings that it believed Appellants were foreclosed from asserting a statute of limitations defense once default judgment was entered, but purported to elicit testimony to rebut that claim, in the event the court decided differently. Upsilon did not "waive" its position that Appellants were foreclosed from raising a statute of limitations defense based on entry of the default judgment under these circumstances. The facts in *Williams* are simply inapposite.

In their third issue, Appellants argue the court refused to grant their request for a continuance seeking more time to review Upsilon's fee petition. Appellants assert that Upsilon's fee petition contained over 1,500 entries spanning more than 50 pages. Appellants complain the court gave them only five days to review the fee petition prior to the scheduled hearing. Appellants insist the trial court rushed the hearing based on Upsilon's mistaken belief that the court would lose jurisdiction to rule on the fee petition 30 days after entry of the judgment in this case. Appellants maintain Upsilon's belief was erroneous and that the court would not have lost jurisdiction to rule on the fee petition, so there was no basis for not continuing the hearing to allow Appellants more time to review Upsilon's claimed fees. Appellants conclude the trial court erred by denying their continuance request, and this Court must grant relief. We disagree.

"The trial court is vested with broad discretion in the determination of whether a request for a continuance should be granted, and an appellate court should not disturb such a decision unless an abuse of that discretion is apparent." *Baysmore v. Brownstein*, 771 A.2d 54, 57 (Pa.Super. 2001).

Instantly, Upsilon acknowledges on appeal that it might have misinterpreted the case law concerning whether the court would have retained jurisdiction to rule on the fee petition more than 30 days after the damages judgment in this case. (*See* Upsilon's Brief at 80). *See also Szwerc v. Lehigh Valley Health Network, Inc.*, 235 A.3d 331 (Pa.Super. 2020),

*appeal dismissed as improvidently granted*, ___ Pa. ___, 278 A.3d 859 (2022) (explaining that so long as fee petition is filed within 30 days of final order, trial court is empowered to act on it even after appeal is taken).

Nevertheless, the record demonstrates that the court did not deny Appellants' request for a continuance based on Upsilon's position regarding the court's alleged lack of jurisdiction. At the March 22, 2021 hearing, Appellants disagreed with Upsilon's position that the court would lose jurisdiction to rule on the fee petition after 30 days of the damages judgment, and counsel suggested the trial court wait to rule on the fee petition until after anticipated appeals in this case. (*See* N.T. Hearing, 3/22/21, at 5-6; R.R. at 2467a-2468a). The court indicated that it understood Appellants' argument, but that it was denying the continuance motion because the court "[o]bviously wanted to resolve all issues in this matter." (*Id.* at 9; R.R. at 2471a). Thus, the court did not deny the continuance based on Upsilon's jurisdictional analysis. We see no apparent abuse of discretion in the court's decision to deny the continuance. *See Baysmore, supra*.

In their fourth issue, Appellants argue Upsilon's fee petition was highly excessive and unreasonable. Appellants emphasize that Upsilon redacted more than 261 hours of time entries, preventing Appellants from meaningfully challenging these fees. Appellants contend that hundreds of hours listed in the fee petition were inappropriate and violated notions of responsible and appropriate client billing. Appellants submit the trial court merely accepted

Upsilon's fee petition without any inquiry into the appropriateness of the charges. Appellants conclude the amounts listed in the fee petition were excessive, and this Court must grant relief. We disagree.

A party to an action may be awarded counsel fees as a sanction against another participant for "dilatory, obdurate or vexatious conduct during the pendency of a matter." 42 Pa.C.S.A. § 2503(7). "[T]he determination of a reasonable fee is an inherently case-specific endeavor." ***Richards v. Ameriprise Financial, Inc.***, 217 A.3d 854, 870 (Pa.Super. 2019). Where "there is record support for the trial court's finding that the rates were reasonable, our standard of review dictates affirmance." ***Id.*** "We will not find an abuse of discretion in the award of counsel fees merely because we might have reached a different conclusion." ***Id.*** (citing ***Hoy v. Angelone***, 554 Pa. 134, 148, 720 A.2d 745, 752 (1998)).

Instantly, the court held a hearing on Upsilon's fee petition on March 22, 2021. At the hearing, Upsilon justified the amount sought in the petition as follows:

> So we have filed a petition for attorneys fees. I do not wish to revisit the past four years of this litigation, it has been painful along the way to say the least.
>
> I have been practicing law for 13 years now and I have frankly never seen anything like this case. It was just repeated bad faith in the course of discovery, so much so that this [c]ourt ultimately entered the sanction of judgment. Along the way, [Upsilon] filed numerous petitions or motions seeking sanctions for the obfuscation of discovery. Along the way, we sought attorneys fees several times.

Under Section [2]503 Subsection 7, a participant who's awarded counsel fees is a sanction against another participant for dilatory or vexatious conduct during the pendency of a matter. I think this falls squarely within that rule. [Appellants'] conduct in this case clearly obfuscated discovery for years. We frankly spent years litigating over whether or not they had to give us those accounting records, went up to the Superior Court, the Superior Court quashed the appeal as, quote, disingenuous, and we came back down here I think for a fourth round of motions for sanctions.

So I think an award of attorneys fees here is appropriate. [Appellants' counsel] I think wants to question and sort of cherry pick time entries of how long should we have spent, you know, drafting briefs in opposition to his Superior Court appeal. And of course the answer is none, we shouldn't have spent any time on it, but we had to. And so, we tracked that time, we billed it to our clients on a monthly basis, and now we're seeking to recover those fees.

[Appellants' counsel] takes issue with some of the redactions in the invoices that we provided. He, however, only provided this [c]ourt with half of the rule. He provided the [c]ourt with the half that says entries that generically state that counsel made a phone call for a specific amount of time to a client is not information protected by the attorney/client privilege, but again, is subject to disclosure. We agree with that, and we've included that information in our invoices. It will say, you know, had a phone call with client or something like that.

But the part that is omitted from his filing is the [c]ourt goes onto say that the relevant question is whether the content of the writing will result in disclosure of information otherwise protected by the attorney/client privilege. For example, descriptions of legal services that address the client's motive for seeking counsel, legal advice, strategy, or other confidential communications are undeniably

connected under the attorney/client privilege.[12]

So you may see entries that say things like legal research and then it's redacted. Well, because we were researching issues that disclose our strategy for litigating the case or responding to questions raised by our client to provide them with advice. So that's why those have been redacted.

The one particular entry [Appellants' counsel] notes is…an entry for five hours that says something like discussion [between counsel]. But that entry is also redacted. So there's—it's not a five-hour conversation [between counsel], it's a host of other activities that follow under the attorney/client privilege that have been redacted.

So the reality is that all the time is true and accurate. If anything, our attorneys fees in this case are low. You will see that, you know, my rate on this case is $150 per hour. That's not my regular rate. My regular rate is $280 an hour, almost double that. Similarly, [our other attorney] is billing in this case at a rate of $130, his regular rate is [$]220. So, you know, if anything, this is a low submission for attorneys fees. Had we handled this on a contingent fee, I think we'd be entitled to the standard one-third, which would be nearly $300,000 in this case. So, you know, essentially there's a prolong[ed] course of discovery of obfuscation in this case. [Upsilon] endured a lot of fees litigating over what I would frankly summarize as nonsense.

Now I do want to recognize that even without the bad faith discovery misconduct, [Upsilon] would of course still have some fees. So I think the egregious nature of the misconduct in this case, an award of all of our attorneys fees is reasonable and appropriate. …

_____

[12] The case Upsilon's counsel is referring to in this argument is ***Levy v. Senate of Pennsylvania***, 619 Pa. 586, 65 A.3d 361 (2013) (explaining that under Right-to-Know Law, descriptions of legal services that address client's motive for seeking counsel, legal advice, strategy, or other confidential communications are undeniably protected under attorney/client privilege; in contrast, entry that generically states that counsel made telephone call for specific amount of time to client is not information protected by attorney/client privilege).

(N.T. Hearing, 3/22/21, at 9-12; R.R. at 2471a-2474a).

After reviewing the fee petition and hearing argument from the parties, the court accepted the amount sought in Upsilon's fee petition and awarded reasonable fees under Section 2503(7). (**See** Order, filed 3/22/21; R.R. at 2187a). Given the lengthy litigation in this case, the record supports the court's conclusion that the fees sought were reasonable. **See Richards, supra**. On this record, we cannot say the court abused its discretion in granting the fee petition. **See id.** Therefore, Appellants' fourth issue affords no relief.

In their final issue, Appellants argue the trial court failed to join Alpha Sigma Phi as a party to this litigation. Appellants claim that Upsilon sought relief directly on behalf of Alpha Sigma Phi in their original complaints. Appellants maintain Alpha Sigma Phi was an indispensable party to this action. Appellants conclude the court erred by denying their request to join Alpha Sigma Phi to this action, and this Court must grant relief. We disagree.

"The failure to join an indispensable party is a non-waivable defect that implicates the trial court's subject matter jurisdiction." **Northern Forests II, Inc. v. Keta Realty Co.**, 130 A.3d 19, 28-29 (Pa.Super. 2015), *appeal denied*, 638 Pa. 756, 158 A.3d 1237 (2016). A party is indispensable:

> [W]hen his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights. If no redress is sought against a party, and its rights would not be prejudiced by any decision in the case, it is not indispensable with respect to the litigation. We have

consistently held that a trial court must weigh the following considerations in determining if a party is indispensable to a particular litigation:

1. Do absent parties have a right or an interest related to the claim?

2. If so, what is the nature of that right or interest?

3. Is that right or interest essential to the merits of the issue?

4. Can justice be afforded without violating the due process rights of absent parties?

*Id.* at 29 (internal citations and quotation marks omitted). "[T]he guiding inquiry in any discussion of indispensability is whether justice can be done in the absence of the parties asserted to be necessary. Such an inquiry entails an assessment of the particular facts and circumstances presented in each case." *City of Philadelphia v. Commonwealth of Pennsylvania*, 575 Pa. 542, 572, 838 A.2d 566, 584-85 (2003).

Instantly, the court explained its denial of Appellants' motion to join the fraternity as an indispensable party as follows:

The Plaintiff and Defendants are partners in 328 Fairmount LP, with the business of renting out a singular property. Alpha Sigma Phi fraternity members are the tenants of aforementioned house. The Plaintiff [Upsilon] is an alumni organization for that fraternity's member[s] and obviously has connections with the fraternity. However, the interests and rights of the absent parties are the relevant issues in determining if they are indispensable, not their connections to the parties to the suit. [Upsilon] has obvious interests and rights in how the partnership property and the leases are managed since that is the partnership's primary business. Furthermore, it is also obvious that the fraternity members as tenants have interests in how the property and

- 36 -

> leases are managed. [Upsilon's] interests may overlap with the fraternity members' interests but their rights are vastly different. A partner can seek to ensure that the partnership is complying with the partnership's legal obligations without violating or prejudicing the contractual rights of absent parties. The fraternity members' rights as tenants are not essential to the merits of the numerous counts in this matter. Finally, the fraternity members' rights are not violated or prejudiced by the proceeding.

(Opinion and Order, filed 6/8/18, at 2; R.R. at 713a).

The record supports the court's analysis that Alpha Sigma Phi is not an indispensable party to this litigation. *See Northern Forests II, Inc., supra*. Additionally, to the extent Appellants claim that Upsilon's **original** complaints sought relief on behalf of the fraternity directly, the amended complaint became the operative complaint in this matter and effectively replaced both original complaints. *See Reichert v. TRW, Inc., Cutting Tools Div.*, 531 Pa. 193, 611 A.2d 1191 (1992) (explaining that filing of amended complaint is essentially withdrawal of original complaint). Upsilon's amended complaint makes clear that it did not seek relief on behalf of Alpha Sigma Phi. (**See** Amended Complaint, filed 12/22/17, at ¶¶ 86, 90, 108; R.R. at 277a, 278a, 282a) (alleging Alpha Sigma Phi holds no interest in Partnership and is not party to action; Upsilon is separate and distinct legal identity; and regarding conversion of assets, issue relates to undergraduate students, but such assets are believed to be property of Upsilon, who maintains certain items such as composites and fraternity plaques as heirlooms). Therefore, Appellants are not entitled to relief on this claim.

In their cross-appeal, Upsilon challenges the court's failure to award punitive damages in this case. Upsilon contends that it has never seen any money from the Partnership since the Partnership began. Upsilon argues that Appellants breached the finest duty of loyalty owed to Upsilon as their partner. Given Appellants' fraudulent conduct (which was established by virtue of entry of the default judgment), Upsilon insists punitive damages were warranted. Upsilon concludes the court's failure to award punitive damages was erroneous, and this Court must grant relief. We disagree.

"[T]he decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder." *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1263 (Pa.Super. 1983). "[T]he purpose of punitive damages is two-fold, to punish the wrongdoer and to deter both him and others from engaging in similar conduct in the future." *Id.* "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchinson ex rel. Hutchinson v. Luddy*, 582 Pa. 114, 121, 870 A.2d 766, 770 (2005). "The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed on review, provided that discretion has not been abused." *Lomas v. Kravitz*, 130 A.3d 107, 129 (Pa.Super. 2015) (*en banc*), *aff'd*, 642 Pa. 181, 170 A.3d 380 (2017). In *Lomas*, this Court affirmed the imposition of punitive damages based on "a

steady and persistent campaign to avoid paying [the a]ppellee…that has continued for nearly 20 years and has involved not only fraudulent transfers of assets…, but years of incessant use and abuse of our civil litigation processes." *Id.* at 129.

Instantly, the court noted that punitive damages are an extreme remedy awarded only when a plaintiff establishes that the defendant acted in an outrageous fashion due to evil motive or reckless indifference to others. (*See* Opinion and Order, filed 2/23/21, at 6-7; R.R. at 1982a-1983a). "The [c]ourt decline[d] to award punitive damages after consideration of the evidence in this matter." (*Id.* at 7; R.R. at 1983a).

Notwithstanding the established fraud in this case (by virtue of the default judgment), this case did not involve "years of incessant use and abuse of our civil litigation processes" similar to the fact pattern in *Lomas*. The fact that Appellants took one interlocutory appeal which this Court subsequently quashed does not constitute an "abuse" of the civil litigation process. On this record, we cannot say that the trial court abused its discretion in denying Upsilon's claim for punitive damages. *See Delahanty, supra*. Therefore, Upsilon's sole issue in the cross-appeal merits no relief. Accordingly, we affirm.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/27/2023